NORMAN M. BUSE AND ANTOINETTE BUSE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

DELMER H. BUSE AND MARY BUSE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5618–76, 5619–76.     Filed March 29, 1979.

*James P. Hunter, Thomas C. Hughes,* and *Thomas R. Collins,* for the petitioners.
*Darrell D. Hallett,* for the respondent.

STERRETT, *Judge:* Respondent, on March 29, 1976, issued statu-

tory notices in which he determined deficiencies in, and additions to, the respective petitioners' Federal income taxes as follows:

Norman M. Buse
and Antoinette Buse

| Year ended Dec. 31— | Deficiency | Additions to tax under | |
| | | Sec. 6651(a) | Sec. 6653(a) |
| 1972 ......................... | $70,707 | --- | --- |
| 1973 ......................... | 50,946 | ($577.10) | --- |
| 1974 ......................... | 252,451 | --- | $12,623 |

Delmer H. Buse
and Mary Buse

| Year ended Dec. 31— | Deficiency | Addition to tax under Sec. 6653(a) |
| 1972 ...................... | $71,292 | --- |
| 1973 ...................... | 50,946 | --- |
| 1974 ...................... | 251,735 | $12,587 |

Our decision herein is limited to the following issues with respect to section 631(a), I.R.C. 1954: (1) Whether Buse Timber & Sales, Inc., owned or held the "Gilbert Creek" timber for the requisite holding period, and (2) the fair market value of the section 631(a) timber as of May 1, 1971, May 1, 1972, and May 1, 1973. Respondent concedes the assertion of the section 6653(a) negligence penalties.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the supplemental stipulation of facts, and exhibits attached thereto are incorporated herein by this reference.

Petitioners Norman M. Buse and Antoinette Buse, husband and wife, resided in Stanwood, Wash., at the time of filing their petition herein. Their joint Federal income tax returns were filed with the Internal Revenue Service Center, Ogden, Utah, for the taxable years in issue.

Petitioners Delmer H. Buse and Mary Buse, husband and wife, resided in Everett, Wash., at the time of filing their petition herein. Their joint Federal income tax returns were filed with the Internal Revenue Service Center, Ogden, Utah, for the taxable years in issue.

Buse Timber & Sales, Inc. (hereinafter Buse), is a subchapter S corporation. Delmer and Norman each own 50 percent of the outstanding stock of Buse and are the president and secre-

tary/treasurer of Buse, respectively. Buse's headquarters is located in Everett, Wash.

On May 29, 1969, Buse entered into a "bill of sale and contract to pay for and remove forest products from State lands" with the State of Washington Department of Natural Resources (hereinafter department) through the Commissioner of Public Lands (hereinafter the commissioner) with respect to timber located in an area designated as "Gilbert Creek." Prior to the execution of this document, the timber had been put up for bid by the department and Buse had been declared and confirmed as high bidder in accordance with the laws of the State of Washington.

The bill of sale and contract relating to the Gilbert Creek tract originally provided that Buse would remove the timber subject to the sale between the dates of February 25, 1969, and December 31, 1971. Buse was granted permission during this period to enter upon the sale area and remove the timber.

Buse had not removed all of the timber by December 31, 1971. On January 24, 1972, Mike Griggs (hereinafter Griggs), an employee of the department in the Sultan district office, wrote two memoranda to Spike Young in the department's sales administration office in Olympia. The import of the memoranda was that Buse had made an oral request for an extension of the Gilbert Creek sale. Griggs recalled the verbal conversation but could not find a letter on file. As close as Griggs could recall, the request had been made in September of 1971. In his memoranda Griggs recommended an extension to December 31, 1972.

Under cover of a letter dated February 7, 1972, an extension agreement was forwarded from the commissioner to Buse by L. V. Morton of the sales administration of the department's timber sales division. The extension agreement provided that for the consideration of a $956 extension fee, an additional $81,818 initial deposit, and the promise by Buse that it would: (1) Log unit 1 before logging unit 2, (2) begin from the west end when logging along SL–S–6030, and (3) "log unit 2 systematically from top down, beginning at the end of each road," the period during which timber could be removed pursuant to the original sales contract would be extended from December 31, 1971, to December 31, 1972. This agreement further provided that:

In the event the Department of Natural Resources is willing to concede a second extension, the following will apply:

1. *Charges.* The charge will be based on rates set forth in Table II of the Department Timber Sale Time Extension Policy dated August, 1966, if an additional one year extension (second extension) should be granted. This charge will be made for land taken out of production. This may include the entire acreage in the sale area if any part of that acreage needs a time extension of timber cutting rights and such time extension prevents burning or management of the entire acreage for timber growth. Acreage burned or sustaining timber growth would not require an extension payment.

2. *Deposits.* The initial deposit in the event of scale sales or initial payment in the event of cash sales is to be increased by payment of an additional 20% or of an amount sufficient to pay the initial purchase price, whichever is the lesser.

3. *Roads.* Road requirements set forth in the contract must be satisfied during the period of the first extension in order to provide the necessary access to planned timber sales (required roads under Clause 12–7–24). The purchaser hereby agrees to pay as liquidated damages $25.00 per calendar day beginning the first day of the second extension, with the exception of Saturday, Sunday, and legal holidays until the roads have been accepted by the State.

On February 23, 1972, the extension fee provided for in the extension agreement was received by the department. The extension agreement was executed by the commissioner and Mr. Delmer Buse on February 24, 1972.

By letter dated November 2, 1972, Lee Dorsey, forest manager at Buse, requested a further extension on the Gilbert Creek sale with respect to the unit 2 area. The request was forwarded from the Sultan office to the sales administration office by memorandum dated November 15, 1972. The Sultan office recommended that an extension to December 31, 1973, be granted. A second memorandum dated December 21, 1972, from the Sultan office to the sales administration office recommended that the extension be expanded to unit 1 for cleanup purposes. Both memoranda included recommendations with respect to possible consideration for the extension.

Under cover of a letter dated February 8, 1973, an extension agreement was forwarded from the commissioner to Buse by L. V. Morton. This agreement extended the period during which timber could be removed to December 31, 1973, for consideration of an extension fee of $1,673, an additional deposit of $163,636 and the promise by Buse that fire trails and a snag free strip 100 feet wide be completed as shown on a map attached thereto. The parties to the extension agreed that any further extensions would be subject to fees calculated at a new rate.

Under cover of a letter dated February 20, 1973, Buse for-

warded a check for the total amount of $165,309 to the department. The extension agreement executed by Mr. Delmer Buse and the surety company was sent to the department on April 5, 1973. On April 10, 1973, the extension was executed by the commissioner.

For the years in issue, Buse cut the following amounts of section 631(a) timber:

### Volume in Board Feet

| | Year ended Apr. 30— | | |
| Species | 1972 | 1973 | 1974 |
| --- | --- | --- | --- |
| Douglas Fir | 4,180,150 | 5,709,580 | 2,778,410 |
| Hemlock-White Fir | 18,547,460 | 23,959,700 | 24,845,170 |
| Cedar | 2,224,460 | 4,031,460 | 1,976,870 |
| Noble Fir | --- | --- | 2,692,110 |
| Spruce | --- | --- | 3,950 |
| White Pine | --- | --- | 118,680 |
| Hardwoods | 56,590 | 698,440 | 296,890 |
| Culls | 3,952,330 | 5,378,640 | 4,835,470 |

Respondent determined that the Gilbert Creek tract should not be included in Buse's section 631(a) timber for its taxable years 1972 and 1973. He also determined the fair market value of Buse's section 631(a) timber for its taxable years 1972, 1973, and 1974.

### OPINION

Section 631(a) provides in pertinent part:

(a) ELECTION TO CONSIDER CUTTING AS SALE OR EXCHANGE.—If the taxpayer so elects on his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than 6 months before the beginning of such year) shall be considered as a sale or exchange of such timber cut during such year. If such election has been made, gain or loss to the taxpayer shall be recognized in an amount equal to the difference between the fair market value of such timber, and the adjusted basis for depletion of such timber in the hands of the taxpayer. Such fair market value shall be the fair market value as of the first day of the taxable year in which such timber is cut, and shall thereafter be considered as the cost of such cut timber to the taxpayer for all purposes for which such cost is a necessary factor * * *

Respondent disallowed petitioners' section 631(a) election based

on his determination that Buse had not owned or held a contract right to cut the Gilbert Creek timber for the requisite 6-month period.

The original contract conveyed title to certain timber to Buse. It further stipulated that Buse was to remove the timber sold therein between the dates of February 1969 and December 31, 1971. The subsequent agreements extended the removal period. The first agreement allowed for removal of timber between December 31, 1971, and December 31, 1972; the second extension allowed for timber removal between December 31, 1972, and December 31, 1973. However, neither extension agreement was formally executed prior to the termination of the previous removal period. Because Washington Revised Code section 79.01.132, which provides "In all cases where timber, fallen timber, stone, gravel, or other valuable material is sold separate from the land, the same shall revert to the state if not removed from the land within the period specified in the sale contract," must be incorporated into the contract, respondent concludes that the ownership of the timber reverted to the State immediately upon the termination of the respective contract periods and, therefore, Buse did not own the timber between December 31, 1971, and February 24, 1972, the date on which the first extension agreement was formally executed by the commissioner and between December 31, 1972, and April 10, 1973, the date on which the second extension agreement was formally executed by the commissioner.

Material to the issue at hand is whether ownership of the timber reverted to the State in the interim between the end of the stipulated contract period and the execution of each extension agreement. Emphasis on the execution dates appears to result in reversion of the timber ownership to the State. However, if the time periods stipulated by the extension agreement are stressed, Buse appears to have continuously owned rights to the timber from February 25, 1969, to December 31, 1973.

Where an ambiguity exists in the meaning of a contract, the primary consideration for purposes of interpretation is the intent of the parties. *Boeing Airplane Co. v. Firemen's Fund Indemnity Co.*, 44 Wash. 2d 488, 268 P.2d 654, 658 (1954). The intent of the parties is gleaned from viewing the contract as a whole in light of the circumstances surrounding the transaction. Herein the sole purpose of the extension agreements was to

extend the period during which Buse could enter the sale area and remove the timber. If ownership reverted to the State as respondent contends, the extension agreements cannot be given effect. In light of this purpose, the consequences resulting if we accept respondent's interpretation are unreasonable.

Both extensions were requested prior to the termination of the respective removal period of persons who were authorized by the contract to act as the commissioner's agent. That those persons chose to forward the extension agreements for execution to the commissioner should not be determinative. State officials testified that granting of the extensions was customary and that they knew of no instance where an extension had not been granted when the logger had made a good-faith effort to remove the trees. Neither do we agree with respondent that the failure of the parties to establish the consideration for the renewal prior to termination of the removal period caused a significant rewriting of the contract. Washington Revised Code section 79.01.132 stipulated that extension fees are—

to be fixed by the department of natural resources, based on the estimated loss of income per acre to the state resulting from the granting of the extension but in no event less than fifty dollars per extension, plus interest on the unpaid portion of the contract. The interest rate shall be fixed, from time to time, by rule adopted by the board of natural resources and shall not be less than six percent per annum.

Thus, Buse had notice at the time it requested the extensions both that extension fees would be charged and the nature of such consideration. The fire trail and snag-free strip were merely substitutions for other forms of fire prevention and control required by the original contract. We find that Buse owned or held a contract right to cut the Gilbert Creek timber for the requisite 6-month period. Cf. *Wasser & Winters Co. v. Jefferson County*, 84 Wash. 2d 597, 528 P.2d 471 (Wash. 1974).

The second issue before the Court is the fair market value of timber for section 631(a) purposes. Such valuation must be made as of the first day of the taxable year during which the timber is cut. Herein the relevant valuation dates are May 1, 1971, May 1, 1972, and May 1, 1973.

The normal valuation standard, the selling price in a hypothetical transfer between a willing seller and a willing buyer as of the given date, is applied to determine valuation. Sec. 1.631-1(d)(2), Income Tax Regs. Such a standard assumes both parties

to the sale possess the most reliable and accurate information available on the date of the hypothetical sale.

The starting point for purposes of calculating the fair market value of timber is comparable sales. Factors in comparing such sales to the subject properties are similarities—quality and quantity of the stand, location and accessibility—and special influences affecting the sales price.

Choice of comparables is, of course, a value judgement and the parties spent a great deal of time and effort deriding the judgment of their adversary's assessors in this respect. In fact, judging from the parties' briefs, seldom has one side been so unimpressed with the expert testimony sponsored by his opponent. If we were to accept each side's criticism at face value, several experts would be headed for the unemployment line. But, of course, we do not accept the criticism of any of the experts as totally accurate or, in many instances, even fair.

A few comments with respect to the testimony are in order. We find that one of respondent's experts erred in discounting all sales in which West Coast Orient, Inc., entered a bid. He intimates that he had personal knowledge, unknown to the other appraisers, that West Coast Orient, Inc., was under a compulsion to buy. We not only question whether West Coast was actually under a compulsion to purchase timber, but point out that the buyer and seller in our hypothetical sale are assumed to have the most reliable and accurate information *available* on the valuation date as distinguished from inside information.

We find that another of petitioner's experts erred in disregarding sales in which the sales price did not exceed the United States Forest Service's minimum bid by 1.1 percent. We have no evidence on the record that sales for less than 1.1 percent above minimum were due to some special circumstance.

Once the comparables are chosen, they must be adjusted to reflect equivalent quality, quantity, accessibility, and location. Neither party hesitates to point out every variance in its opponent's experts' approach with respect to these adjustments. In doing so, they intimate that such differences reflect gross errors. We agree with respondent that, where comparables containing estimates of logging cost and timber quality are used, the better approach is to compare such estimates of Buse's logging costs and timber quality. We further agree with respondent that, where possible, use of the comparable method rather than the

conversion return method of calculating value is the better approach. We agree that it is inappropriate within the meaning of section 1.611–3(f)(1), Income Tax Regs., to use hindsight, after scaling, to find the value of the trees. See *Ellingson Timber Co. v. Commissioner*, T.C. Memo. 1977–197. We discern no real difference between a petitioner's expert's composite approach and a respondent's expert's individual approach. Finally, we agree that the value should not be increased because Buse could have sold the timber in toto. While it is probable that the sale of a tract containing two truckloads of timber would be sweetened by a simultaneous sale of a more productive tract located in the same area, petitioners have not presented us with evidence to the effect that a sale en masse would increase the value or even that such a sale would be economically feasible.

On the other hand, we agree with petitioner that the new "yarding unutilized material" requirements could have depressed sales prices to some extent. We also agree with petitioners' assertion that use of the conversion return method is a valuable check on results derived by the comparable method. See *Lysek v. Commissioner*, T.C. Memo. 1975–293. We further find that respondent's experts have improperly apportioned the availability of the export timber over the years. Such apportionment ignores the hypothetical character of the valuation. Valuation generally is based on the highest and best use of the property to be valued. Cf. *Cascade Lumber Co. v. Squire*, an unreported case (W.D. Wash. 1957, 52 AFTR 1290, 57–2 USTC par. 9841).[1] If to do so would be economically beneficial, the hypothetical owner could effect a sale of all exportable timber at any time, increasing the fair market value of the timber for any given year.

In summation, the parties have presented us with six assessments of fair market value for each of the three relevant dates calculated by five different experts. We have carefully cruised through each report. We are well aware of the bias reflected in

---

[1]We believe that petitioners have misconstrued Judge Boldt's comment with respect to a taxpayer being "entitled to an evaluation for the timber cut in the tax year based on the *highest price* as of the first day of the tax year that an informed and willing buyer would have paid to an informed and willing seller * * * ." (Emphasis added.) We do not think that the reference to highest price is to be taken literally. The fair market value formula produces a reconstructed price calculated for the *highest and best use,* or in the manner of sale most advantageous to the seller.

However, calculating the value on the highest possible price a seller could obtain skews the result. Such calculations must be tempered by consideration of what a buyer would pay. The resultant price must, therefore, be adjusted to reflect both high and low sales for the highest and best use.

the final results of the assessments. We have carefully considered each expert's testimony on direct and cross-examination. Virtually by definition of terms, picking a value on which a willing buyer and willing seller would agree in a hypothetical sale involves considerable speculation. Nonetheless it is our responsibility to select that value and we do so. We find the fair market value of the stumpage as of May 1, 1971, May 1, 1972, and May 1, 1973, to be as follows:

| | Value for year beginning May 1— | | |
|---|---|---|---|
| Species | 1971 | 1972 | 1973 |
| Douglas Fir-USFS | $60 | $83 | $142 |
| State/private | 50 | 79 | 188 |
| Hemlock-USFS | 45 | 57 | 157 |
| State/private | 46 | 77 | 194 |
| Cedar-USFS | 50 | 32 | 100 |
| State/private | 51 | 77 | 166 |
| Noble Fir | --- | --- | 175 |
| Spruce | --- | --- | 185 |
| White Pine | --- | --- | 185 |
| Hardwood and utility | 10 | 15 | 25 |

Several minor issues were not covered at trial pending settlement thereof by the parties; accordingly

*Decisions will be entered under Rule 155.*