EARL ROGERS, JR., and MILDRED ROGERS, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Rogers v. Commissioner
Docket Nos. 2001-78, 2002-78, 2003-78, 2004-78, 2005-78, 8093-78, 4147-80
United States Tax Court
T.C. Memo 1983-420; 1983 Tax Ct. Memo LEXIS 365; 46 T.C.M. (CCH) 789; T.C.M. (RIA) 83420; July 21, 1983. Robert E. Murrin, for the *366 petitioners. Edward D. Fickess, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: In these consolidated cases, respondent determined the following deficiencies in petitioners' Federal income taxes: Petitioner
Docket No.
Year
Amount
Earl Rogers, Jr.
2001-78
1974
$36,748.00
and Mildred Rogers
1976
34,774.00
Frank H. Aloi and
2002-78
1973
1,287.00
Francine Aloi
1974
2,510.00
1976
2,091.00
Joseph E. Riehle and
2003-78
1973
959.56
Janyce L. Riehle
1974
1,269.40
1976
1,990.00
Lewis C. Jenkins and
2004-78
1973
5,025.00
Janet R. Jenkins
8093-78
1974
11,172.00
4147-80
1976
8,285.00
David P. Rogers and
2005-78
1973
2,320.00
Margaret K. Rogers
1974
5,020.00
1976
4,715.00
After concessions, the issues for decision are: (1) the fair market value, for purposes of section 631(a), [2] of timber held by petitioners' Subchapter S corporation on October 1, 1972, October 1, 1973, and October 1, 1975; (2) whether petitioners' Subchapter S corporation is entitled to deduct $324,343.00 in state sales taxes in the taxable year ending September 30, 1976. *367 FINDINGS OF FACT ISSUE 1: Fair Market Value of Timber Some of the facts have been stipulated and are found accordingly. Petitioners Earl Rogers, Jr. and Mildred Rogers, husband and wife, resided in Olean, New York, when they filed their petition in this case. They filed their joint 1974 Federal income tax return on June 16, 1975, and timely filed their joint 1976 Federal income tax return with the North Atlantic Service Center in Andover, Massachusetts. Petitioners Frank H. Aloi and Francine Aloi, husband and wife, resided in Portville, New York, when they filed their petition in this case. They timely filed their joint Federal income tax returns for 1973, 1974, and 1976 with the North Atlantic Service Center in Andover, Massachusetts. Petitioners Joseph E. Riehle and Janyce L. Riehle, husband and wife, resided in Allegany, New York, when they filed their petition in this case. They timely filed their joint Federal income tax returns for 1973, 1974, and 1976 with the North Atlantic Service Center in Andover, Massachusetts. *368 Petitioners Lewis C. Jenkins and Janet R. Jenkins, husband and wife, resided in Mansfield, Pennsylvania, when they filed their petition in this case. They timely filed their joint Federal income tax returns for 1973, 1974, and 1976. Petitioners David P. Rogers and Margaret K. Rogers, husband and wife, resided in Allegany, New York, when they filed their petition in this case. They filed their joint 1974 Federal income tax return on June 16, 1975, and timely filed their joint 1973, and 1976 Federal income tax returns with the North Atlantic Service Center in Andover, Massachusetts. During the years in issue, Earl Rogers, Jr. (hereinafter Rogers), Frank H. Aloi, Joseph E. Riehle, Lewis C. Jenkins, and David P. Rogers (hereinafter collectively referred to as petitioners) were the sole shareholders in Portville Forest Products, Inc. (hereinafter PFP), a Subchapter S corporation with its principal place of business in Portville, New York. At all relevant times herein, Rogers was the President and Manager of PFP, and Frank Aloi was the Secretary-Treasurer. In 1974, Lewis Jenkins became Vice-President. PFP was owned in approximately the following proportions during the years in *369 issue: Name
Approximate Percentage Interest
Earl Rogers, Jr.
59%
David P. Rogers
15%
Lewis C. Jenkins
15%
Frank H. Aloi
6%
Joseph E. Riehle
2%
In 1965, PFP elected to be taxed as a small business corporation under Subchapter S, and thus during the years in issue, PFP was not subject to the income taxes imposed by Chapter 1 of Subtitle A. The petitioners, as shareholders of PFP, were taxed on the income generated by PFP's operations. PFP reported income on an accrual basis with a fiscal year running from October 1 through September 30. At all relevant times herein, PFP was engaged in the manufacture and sale of timber products. For use in its business, PFP cut timber which it either owned, or had a contract right to cut, for a period of more than six months before the beginning of each fiscal year. PFP duly elected to treat the cutting of its timber under the provisions of section 631(a) for Federal income tax purposes. The timberland that PFP purchased was located on scattered tracts within a four county area surrounding PFP's mill in Portville, New York. Generally, PFP's timberland purchases were made through real estate agents, local farmers, *370 and other individuals who advertised their land for sale in newspapers; no purchases were made from state or federal lands. After land was acquired and held for a minimum of six months, PFP harvested the timber. Pursuant to a unique logging practice, PFP cut and hauled to its mill a greater length of each tree than was customary in the region. The additional length consisted entirely of narrow tree tops that other mills left in the woods because they produced low quality lumber. Thus, PFP generally obtained a greater volume of raw timber from a given tract than would a competitor. PFP's unique logging practice was a direct outgrowth of a business philosophy which sought maximum lumber production with little regard for the quality of lumber produced. A second and more significant consequence of this business philosophy was a milling policy which sought to produce the largest amount of lumber in the least amount of time. [3] The result was a high speed process that produced a significant quantity of the lowest quality "pallet" lumber. *371 After the timber was milled, the resulting lumber was graded and weighed and the dally volume of lumber was calculated by multiplying the weight of the lumber by a factor that varied according to species and quality. From these figures Rogers calculated the annual lumber production and used it, for purposes of section 631(a), as the volume of timber cut during the year. To value the timber, Rogers used a modified net back to stump method. Under this procedure, Rogers calculated the fair market value of the standing timber by deducting from lumber sale gross receipts all selling costs, logging and manufacturing costs, and a 10 percent profit and risk factor. Rogers then averaged this fair market value figure with the fair market value figure obtained by performing the same calculation but using in place of the actual lumber sale gross receipts the hypothetical gross receipts that would have been obtained had PFP sold its lumber at the prices listed in the Hardwood Marketing Bulletin, a weekly national trade journal. The resulting average was the fair market value of standing timber cut during the taxable year claimed by PFP on its tax returns during the years in issue. *372 In the notices of deficiency, respondent determined that the fair market value of the standing timber cut by PFP during each year in issue was lower than that claimed by PFP. The following chart reflects the fair market value of harvested timber claimed by petitioners, and the lower fair market value determined by respondent for each of the taxable years in issue: PFP's Taxable
Petitioners' [4]
Respondent's
Year Beginning
FMV/MBF Timber [5]
FMV/MBF Timber
October 1, 1972
$105.00
$31.00
October 1, 1973
105.00
36.00
October 1, 1975
105.00
37.00
As a result of these lower fair market values respondent decreased the long-term capital gains that PFP claimed, pursuant to section 631(a), from the cutting of its timber and increased the company's ordinary income by a proportionate amount. Since PFP is a Subchapter S corporation, these changes resulted in increases in petitioners' Federal income tax liabilities. ISSUE 2: *373 Deductibility of State Sales Tax At some point prior to August 22, 1975, PFP was notified by the State of New York that it owed $324,343 in sales taxes for the period 1965 through February 28, 1974. On August 22, 1975, PFP commenced an action in the New York State Supreme Court in order to challenge the alleged liability. On August 31, 1976, the State of New York filed a tax lien in the Office of the Cattaraugus County Clerk for the full amount of the asserted liability. PFP did not pay any part of the alleged sales tax liability during its taxable year ending September 30, 1976. In December 1976, PFP gave the New York State Tax Commission a $10,000 bond and, in April 1978, the company deposited $15,000 into an escrow account at the Manufacturer's Hanover Trust Company, Olean, New York, to secure payment of the alleged liability. The terms of the escrow required tha any amount ultimately determined to be owed for New York State sales taxes would be paid to the New York State Tax Commission while any excess would be refunded to PFP. PFP's liability for the alleged state sales tax was still awaiting trial in the New York State courts as of the date this case was heard. *374 OPINION ISSUE 1: Fair Market Value of Timber We must determine the fair market value, for purposes of section 631(a), of timber cut by petitioners' Subchapter S corporation on October 1, 1972, October, 1, 1973, and October 1, 1975. Section 631(a) provides that a taxpayer may elect to treat the cutting of timber during a taxable year as a sale or exchange of a capital asset, provided that he has owned the timber or held the contract right to cut such timber for more than six months before the beginning of the taxable year. [6] Capital gain or loss is recognized by the taxpayer in an amount equal to the difference between (1) the fair market value of the timber as of the first day of the taxable year in which the timber is cut, and (2) the taxpayer's adjusted basis for depletion of the timber. Section 631(a), section 1.631-1(d)(1), Income Tax Regs. Since PFP uses a fiscal year ending on September 30, the relevant valuation dates are October 1 of 1972, 1973, and 1975. *375 The normal standard for valuing timber eligible for section 631(a) treatment is the hypothetical selling price in a transaction between a willing seller and a willing buyer, both of whom have the most reliable and accurate information available on the valuation date. Section 1.631-1(d)(2), Income Tax Regs.; Buse v. Commissioner,71 T.C. 1129, 1135-1136 (1979). Among the factors to be considered in determining the fair market value of timber on a given date are the character, quality, quantity, location, and accessibility of the timber. Disinterested expert appraisals may also be considered. Section 1.611-3(f), Income Tax Regs.
Generally, when using expert reports, the comparable sales method [7] is preferred over the conversion return method. Buse v. Commissioner,supra at 1136-1137; Peek v. Commissioner,T.C. Memo. 1983-224. The conversion return method is, however, a valuable check *376 on results derived from the comparable method. Buse v. Commissioner,supra at 1137. In determining the fair market value of PFP's timber we have the opinions of three experts, Donald F. Beach and Shag Taynton for respondent, and Curtis H. Bauer for petitioner. The appraisers for both parties used the comparable sales approach; hoever, insamuch as choice of comparables is a value judgment, the parties' experts disagreed as to the appropriate comparables. Respondent's experts conclude that no "true" comparables exist for PFP on the premise that PFP purchases timber of lower quality and smaller size than most other mills in the area. [8] Consequently, they used PFP's own purchases to establish the fair market value. [9] Petitioners' expert, on the other hand, used timber sales from public and private lands *377 in the four county area that included few, if any, of PFP's purchases. We find varying degrees of weakness in the methods of analysis used by each of the witnesses and conclude that none of their opinions is totally dispositive of the value of this timber. The fundamental flaw in respondent's experts' reports is that they based their fair market value estimates on the volume of lumber produced by PFP rather than on the estimated volume of standing timber cut by PFP, [10] as required by the statute and regulations. Section 631(a) and section 1.631-1(a)(1), Income Tax Regs. This error resulted in a significant undervaluation of PFP's *378 timber for two reasons. First, lumber yield is generally higher than estimated timber volume, [11] and using the larger timber yield figure in the denominator of the fraction fair market value / estimated timber volume results in a lower value per unit of timber. Moreover, the undervaluation is exaggerated because PFP obtained a higher lumber yield per unit of timber than was common in the industry. Respondent's experts thus reached an artificially low fair market value. *379 Second, respondent's experts used PFP's historic timber cost as the starting point for their calculations. PFP typically held timber anywhere from six months to several years, and the historic cost does not reflect the growth and appreciation of timber which normally occurs between the date it is purchased and the date it is cut. Pope & Talbot, Inc. v. Comissioner,60 T.C. 74, 79 (1973), affd. 515 F. 2d 155 (9th Cir. 1975). Respondent's experts were careful to base their estimates on the cost of timber purchases six months before and six months after each applicable valuation date in an effort to provide the closest estimate of the fair market value of the timber purchased. However, this still does not properly account for the appreciation with PFP obtained from holding the timber before cutting. In other words, although PFP's purchases may be a good indication of the value of the timber when purchased, they are not determinative of the value of the timber when it was harvested after additional growth. Petitioners' expert's report, on the other hand, contained several flaws which rendered the values therein excessive. Although the comparables *380 used were probably based on the fair market value of standing timber, approximately half involved higher value Federal and state timber. PFP never purchased Federal or state timber and use of these sales figures is inapposite. In addition, the comparables Bauer used contained a greater percentage of higher value species than was cut by PFP during the years in issue. Finally, Bauer improperly included in his estimates the costs of putting in roads, drainage ditches, and cutting the trees. As a result of these problems, the values Bauer obtained were too high. Since we have been called upon to determine the value of timber we will do so. However, there is no mathematical formula that can provide the necessarily speculative value to be placed on a hypothetical sale between willing buyers and sellers.Having considered all of the testimony and experts' reports in light of the unique facts and circumstances of this case, we conclude the fair market value on the appropriate valuation dates were as follows: Valuation Date
Fair Market Value per MBF Timber
October 1, 1973
$51.00
October 1, 1974
59.00
October 1, 1976
54.00
ISSUE 2: Deductibility of State Sales *381 Tax We must determine whether PFP is entitled to claim a deduction for a state sales tax liability for its taxable year ending September 30, 1976, when no amount was paid during such year and PFP disputed the entire amount. Under the accrual method of accounting, deductions are generally allowed in the taxable year in which all events occur which determine the fact of liability and fix the amount thereof with reasonable accuracy. Section 1.461-1(a)(2), Income Tax Regs.; United States v. Anderson,269 U.S. 422 (1926). Where, however, a taxpayer contests the liability, no deduction may be taken until the liability has been finally determined since, until that time, the liability is not certain or ascertainable in amount. Security Flour Mills, Co. v. Commissioner,321 U.S. 281 (1944); Dixie Pine Products Co. v. Commissioner,320 U.S. 516 (1944); Globe Tool & Die Manufacturing Co. v. Commissioner,32 T.C. 1139 (1959). Petitioners argues that the New York state tax lien has the effect of a *382 nonappealable final judgment entered by the New York State Supreme Court, such that PFP's liability for the tax has been finally determined, entitling them to the deduction for the taxable year ending September 30, 1976. Respondent, on the other hand, argues that the deductibility of the state tax is controlled by the provisions of section 461(f), which PFP did not satisfy during its taxable year ending September 30, 1976, and that the entire deduction made be disallowed. We agree with respondent.
Section 461(f)[12] modifies the rule established in Dixie Pine Products,supra, to allow accrual of a contested liability under specified circumstances. The implication of this section is that, unless its requirements are satisfied, a contested liability is not treated as accrued for tax purposes. Doug-Long, Inc. v. Commissioner,73 T.C. 71, 75-76 (1979). Section 1.461-2(b)(2), Income Tax Regs., defines a "contest"; A contest arises when there is a bona fide dispute as to the proper evaluation of the law or the facts necessary to determine *383 the existence or correctness of the amount of an asserted liability. It is not necessary to institute suit in a court of law in order to contest an asserted liability. An affirmative act denying the validity or accuracy, or both, of an asserted liability to the person who is asserting such liability, such as including a written protest with payment of the asserted liability, is sufficient to commence a contest. Thus, lodging a protest in accordance with local law is sufficient to contest an asserted liability for taxes. * * * *384 The parties stipulated that PFP has continued to challenge the state sales tax liability in the New York State courts up until the time of the instant trial. By definition, therefore, PFP has continued to contest its asserted state sales tax liability. Since PFP made no transfers within the meaning of section 461(f)(2) and section 1.461-2(c), Income Tax Regs., during its fiscal year ending September 30, 1976, the accrued deduction for state sales taxes is disallowed. [13]
To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Frank H. Aloi and Francine Aloi, Docket No. 2002-78; Joseph E. Riehle and Janyce L. Riehle, Docket No. 2003-78; Lewis C. Jenkins and Janet R. Jenkins, Docket Nos. 2004-78, 8093-78, 4147-80; and David P. Rogers and Margaret K. Rogers, Docket No. 2005-78.↩
2. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.↩
3. For example, contrary to the normal practice of sawing four sides from a log to produce a square cant from which lumber could be sawed, PFP would remove only two sides of a log before sawing it into boards. In addition, PFP would not turn the logs being sawed to maximize the quality of the lumber produced.↩
4. The figures shown for petitioners are unreduced by the tree cutting costs claimed by PFP in reporting the fair market value of timber on its return for each year in issue. ↩
5. MBF is an abbreviation for thousand board feet.↩
6. During the years in issue, the holding period for long-term capital gains was six months.↩
7. The comparable sales approach to valuation (also known as the market data approach) involves selecting sales of property similar to the property being valued and adjusting the sale price to account for all materially different facts and circumstances existing between the two properties. See Peek v. Commissioner,T.C. Memo. 1983-224↩.
8. The conflicting evidence regarding the quality and size of PFP's timber purchases precludes us from determining whether respondent's experts' premise was, in fact, correct. We note, however, that since PFP maximized lumber production at the expense of lumber quality, it is logical that they would buy less expensive (i.e., lower quality) timber. ↩
9. Respondent's experts maintain that PFP purchased timber from different sellers and thus the prices paid accurately reflect the fair market value of PFP's timber.↩
10. Both experts estimated fair market value by dividing the annual cost of all of PFP's timber purchases by the total volume of lumber actually produced from that timber. In other words, respondent's experts improperly used the formula acquisition cost / lumber production instead of fair market value first day of taxable year / estimated timber volume mandated by section 631(a)↩. The formula utilized by respondent's experts merely provides the average annual acquisition cost per unit of lumber rather than the fair market value of the standing timber cut by PFP. 11. This is a consequence of the assumptions regarding timber size, tree taper, milling technique, etc., built into the Doyle rule which is commonly used to estimate timber in the area around PFP's mills.↩
12. SEC. 461. GENERAL RULE FOR TAXABLE YEAR OF DEDUCTION. (f) Contested Liabilities.--If-- (1) the taxpayer contests an asserted liability, (2) the taxpayer transfers money or other property to (3) the contest with respect to the asserted liability exists after the time of the transfer, and (4) but for the fact that the asserted liability is contested, a deduction would be allowed for the taxable year of the transfer (or for an earlier taxable year), then the deduction shall be allowed for the taxable year of the transfer. This subsection shall not apply in respect of the deduction for income, war prefers, and excess profits taxes imposed by the authority of any foreign country or possession of the United States.↩
13. On brief, respondent stated that 1977 and 1978, were the proper years for claiming a deduction as to the asserted state tax liability. These years are not before the Court, and we do not have jurisdiction to redetermine PFP's tax liability to reflect such deductions. Section 6214(b).↩