WILLAMETTE INDUSTRIES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, RespondentWillamette Indus. v. CommissionerDocket Nos. 275-84, 38880-84, 10578-86United States Tax CourtT.C. Memo 1992-407; 1992 Tax Ct. Memo LEXIS 425; 64 T.C.M. (CCH) 202; T.C.M. (RIA) 92407; July 16, 1992, Filed *425 Decision will be entered under Rule 155. For Petitioner: Charles P. Duffy and Philip N. Jones. For Respondent: Alan Summers, Robert F. Geraghty, Randall E. Health, and Wendy S. Pearson. DRENNENDRENNENMEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: These consolidated cases were originally assigned to Special Trial Judge Hu S. Vandervort pursuant to section 7456(d)(4), redesignated section 7443A(b)(4) by section 1556 of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2755, and Rules 180, 181, and 183. 1 With the consent of the parties, the cases were subsequently assigned to Special Trial Judge Carleton D. Powell pursuant to section 7443A for decision. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE POWELL, Special*426 Trial Judge: Respondent determined deficiencies in petitioner's Federal income taxes for the following years in these consolidated cases: YearDeficiency1878$ 4,049,33419793,526,506198012,320,646198144,604198263,5781983274,480After concessions by the parties and a separate trial on the section 461(f) issue, 2 the issue for decision here is the fair market value as of the first day of 1978, 1979, and 1980 (hereinafter sometimes referred to collectively as the years in issue) of timber cut by petitioner and its subsidiaries in Oregon, Louisiana, Arkansas, and Texas, and the fair market value as of the first day of 1978 and 1979 of timber cut by Freres Veneer Co. in Oregon. For convenience, reference to petitioner includes both Willamette Industries, Inc. and any of its subsidiaries that harvested timber in the applicable areas during the years at issue. *427 FINDINGS OF FACT At all relevant times petitioner, an Oregon corporation, was engaged in forest management, logging, and the production of various wood and paper products. At the time it filed the petitions with this Court, petitioner's principal office was located in Portland, Oregon. Petitioner filed consolidated income tax returns for the 1978 through 1980 years using the calendar year and the accrual method of accounting. For the taxable years ended December 31, 1978, 1979, and 1980, petitioner's consolidated returns also include the income of its subsidiaries Western Kraft East, Inc., Wimer Logging Co., and Santiam Southern Co. Its 1978 consolidated return also includes the income of its subsidiaries Bend-Willamette Corp., Mobol Products, Inc., Wimer Trucking Co., and Totem Building Supplies, Inc. Its 1980 return also includes the income of its subsidiaries Woodard-Walker Lumber Company, Inc., Woodard-Walker Land & Timber Corp., and Woodard-Walker-Willamette, Inc. This is the third time we have had occasion to address the question of the valuation of eligible timber cut by petitioner. In order to conserve our limited judicial resources, we will not again describe fully*428 petitioner's timber operations in Oregon and Louisiana. See Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1980-577 (1971-73 years) (Willamette I) and Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1987-479 (1974-77 years) (Willamette II), as supplemented by T.C. Memo. 1990-339 (Supp. Memo. Op.) and T.C. Memo. 1991-389 (Second Supp. Memo. Op.), however, for a complete description of these operations.3Before 1978, petitioner duly elected to treat the cutting of timber by it as a sale or exchange under the provisions of section 631(a). Petitioner harvested the eligible timber in Oregon, Louisiana, Arkansas, and Texas. For convenience, reference to Louisiana timber includes timber harvested in Louisiana, Arkansas, and Texas (hereinafter sometimes*429 referred to collectively as the South). Since there are some material differences in the factors relevant to the valuation of the Oregon and the Louisiana timber, we will discuss each area separately. Petitioner's Oregon operations are located in Northwestern Oregon, generally west of the summit of the Cascade Mountains in the Willamette River drainage system and adjacent coastal drainage systems of the Siuslaw, Alsea, Siletz, Salmon, Nestucca, and Trask Rivers. Timber harvested during 1978, 1979, and 1980 in Oregon came from several sources, including petitioner's property (fee lands); the United States Forest Service (USFS); the Bureau of Land Management (BLM); the State of Oregon; the city of Corvallis, Oregon; the City of McMinnville, Oregon; and various private timber cutting contracts. During these years, petitioner cut approximately 53 to 60 percent of the total eligible timber from fee lands or under private timber cutting contracts, while it cut the remaining timber primarily from USFS and BLM lands. Douglas fir comprised over 70 percent of the timber harvested each year. Beginning in 1959 and continuing through 1979, petitioner also was engaged as an equal joint venturer*430 with Freres Lumber Co., Inc. (an otherwise unrelated company), in logging and in the manufacture of veneer in Oregon under the name "Freres Veneer Company" (Freres). Before 1978, Freres duly elected to treat the cutting of timber by it as a sale or exchange under the provisions of section 631(a). Petitioner and Freres harvested the following volume of eligible timber in Oregon during 1978, 1979, and 1980: EntityYearVolume in Board FeetPetitioner1978292,940,310Freres28,540,290Total321,480,600Petitioner1979313,376,646Freres25,923,800Total339,300,446Petitioner1980304,982,329The fair market values of the eligible timber as claimed by petitioner on the tax returns for 1978, 1979, and 1980, as amended, and as determined by respondent in the notices of deficiency for these years, are as follows: Return orEntityYearAmended ReturnNotice of deficiencyPetitioner1978$ 64,616,639$ 53,767,431Freres5,970,90744,914,249Total$ 70,587,546$$ 58,681,680Petitioner1979$ 89,008,987$ 76,332,006Freres6,560,7525,186,672Total$ 95,569,739$ 81,518,678Petitioner1980$ 97,816,528$ 103,292,080*431 The fair market values (rounded) of the eligible timber as opined by the expert witnesses retained by the respective parties are as follows: Respondent'sPetitioner's expertsexpertEntitySharrerMarshGranvallNRM1978Petr.$ 61,371,091$ 61,931,739 $ 63,052,678$ 60,426,888 Freres4,929,4504,924,836 5,063,2815,046,755 Total$ 66,300,541$ 66,856,575 $ 68,115,959$ 65,473,643 Alternate (excluding foreign sales of timber;   see infra)$ 65,512,785 1979Petr.$ 85,572,735$ 86,245,234 $ 94,105,320$ 72,792,105 Freres5,500,0015,725,591 5,788,3564,760,057 Total$ 91,072,736$ 91,970,825 $ 99,893,676$ 77,552,162 Alternate (excluding foreign sales of timber;   see infra)$ 73,778,024 1980Petr.$ 94,288,717$ 97,385,778 $ 96,496,158$ 89,960,333 Alternate (excluding foreign sales of timber;   see infra)$ 89,402,014 *432 USFSIn Oregon, USFS timber contracts are awarded at an oral auction to the high qualified bidder. To qualify to bid at the oral auction, a bidder must submit a sealed bid at least equal to the USFS minimum price. The bidding is by an amount per thousand board feet (MBF) for each species open for bidding. The total dollars bid are based on USFS volume estimates. Species that comprise a minor part of the overall volume may be closed to bidding. For these species, the purchaser pays the minimum acceptable bid rate advertised by the USFS. Because of the manner of bidding on USFS contracts, one species may receive a disproportionately high bid. This can happen, for example, when a bidder believes that a species not open for bidding is worth more than the minimum bid price or when a bidder believes that the volume on a species open for bidding is actually less than the volume estimated by the USFS. Under the typical USFS contract, the purchaser does not pay for the timber until it is harvested and is charged only for the volume of timber actually cut, scaled, and removed (sometimes referred to as pay-as-cut recovery contracts). However, the purchaser is obligated to remove*433 all of the designated timber on the sale tract. The USFS retains title to the timber until the purchaser cuts, scales, removes, and pays for it. Risk of loss remains with the USFS until the purchaser cuts and removes the timber. Under the terms of USFS contracts, the successful bidder is required to build certain logging roads on USFS lands to USFS specifications. The bidder acquires no ownership interest in the roads, which become the property of the USFS. In return, the purchaser is given a credit against the purchse price of the timber (purchaser road credit). The amount of the purchaser road credit is equal to the USFS's estimate of the expected road costs and is known to the bidders at the time their bids are placed. The cost of the timber with the estimated cost of constructing the road is referred to as the "high bid" while the cost of the timber less the purchaser road credit is referred to as the "statistical high bid." The actual road costs incurred by the purchaser may be higher or lower than the purchaser road credits. Petitioner amortized the cost of constructing the roads in an amount allocable to the percentage of the timber removed each year. The amortization*434 deduction for the road construction costs is not at issue in this case. BLMBLM timber is sold on a lump-sum basis at oral auctions. Lump sum means that the purchaser must pay the total amount bid regardless of the volume ultimately removed. The bid rate multiplied by the BLM estimate of the timber volume determines the total price. The risk of underrun (and the benefit of overrun) is on the purchaser. HILLIn 1946, petitioner's predecessors entered into long-term contracts to harvest timber located on land in Oregon owned by the Lewis W. and Maud Hill Family Foundation and the Hill Foundation Co. The timber is located primarily in the South Santiam River drainage system. The contracts establish minimum and maximum annual harvest volumes and set the purchase price as a percentage of petitioner's profits from the manufacture of the timber into lumber, plywood, and other products. Volumes are adjusted on the basis of the actual logs processed through petitioner's mills. The Hill timber was the single largest source of private timber volumes harvested by petitioner in each of the years at issue. AVERYThe Avery family owns a large tract of timberland located *435 in the North Santiam River drainage system, adjacent to petitioner's fee property in the Snow Peak area, and close to the Hill property. The Avery timber was sold on a sealed bid basis under pay-as-cut recovery contracts and called for the harvesting of all merchantable green and dead timber in designated areas. Generally, purchasers paid at a rate per thousand board feet for each grade of logs by species. Purchasers deposited a downpayment and furnished a performance and payment bond. A purchaser could harvest the timber at any time over the contract term. The Avery timber was sold from the same tract on a consistent basis under similar contractual terms from 1968 through 1980. Avery tracts are the only private tracts on which there are continuing records of sales. During 1978 through 1980, especially from mid-1978 through 1980, bid prices for standing timber, particularly public timber, were rising rapidly, with intense competition for most offered sales. The ration of bid prices to appraised prices for standing timber jumped from an average of about 1.50 in 1978 to as high as 3.20 in 1980. Some individual timber sales sold for as much as four to five times the appraised*436 prices, with 15 to 20 qualified bidders involved in the oral auction process. During this period, especially for public timber sales, bidders added an inflation factor to the estimated value of the timber as of the bid date to establish their bid price. The inflation factor used varied by company and time, ranging from 5 to 15 percent. During this same time, purchasers, especially public timber purchasers, began to delay cutting the timber until the latter years of the contract. During the years 1971 through 1980, petitioner exported no logs from the United States. For the years at issue, the State of Oregon assessed a severance tax for private fee timber harvested in those years. South Petitioner's southern headquarters is located in Ruston, Louisiana. Petitioner harvested the Louisiana eligible timber primarily in North Louisiana, although it cut some of the timber in South Central Arkansas and East Texas. Timber harvested during 1978 and 1979 in the South came from several sources, including fee lands; Government owned lands, such as the USFS; privately-owned industrial lands, including Continental Can Co., Inc. (CCC); and privately owned nonindustrial lands. In the Louisiana*437 timber market area, approximately 66 percent of the commercial forest land is held by nonindustrial private land owners, 23 percent is held by industrial owners, and the remainder is owned by the USFS and other public agencies. Petitioner harvested the following approximate percentages of eligible timber during 1978 and 1979 from these sources: Source19781979CCC34%29%USFS2421Fee1524Other sources2726Before and during 1978 and 1979, petitioner and CCC entered into certain pay-as-cut contracts. The timber on the CCC land is at least equal in value to the USFS eligible timber and was some of the best eligible timber petitioner cut in 1978 and 1979. In 1978 and 1979, representatives of petitioner and CCC met in January of each year and negotiated the price petitioner would pay that year for the CCC timber (the negotiated market value). The negotiated market value was based on selected timber transactions occurring in the prior 6-month period. Under the agreement, petitioner actually purchased the timber each year for 95 percent of the negotiated market value. USFS contracts in Louisiana are cut out on a compartment or unit basis. The bid price for a *438 unit or compartment on a USFS tract is based on the volume determined from the cruise 5 date; therefore, the growth inures to the benefit of the purchaser. In the South, the USFS generally sells its timber on a lumpsum basis rather than on a pay-as-cut recovery basis. USFS sales contracts in the South are awarded to the highest bidder, on a sealed bid basis. The USFS timber contracts provide high quality timber. As in Oregon, the USFS requires purchasers to build roads to USFS specifications on some of the tracts it sells. The purchaser road credit is used to pay for the timber on the tract based on the USFS estimated cost of constructing the road. In USFS contracts, if the contracted timber is rendered unfit for use or is damaged or killed by fire, storm, southern pine beetle, or other cause, the USFS deducts the volume of damaged or destroyed timber*439 from the volume to be cut under the original contract and either negotiates a salvage price with the contract holder or readvertises this volume for bids on the salvage. Log scales or rules provide a method of estimating the amount of lumber which can be cut from a log or a tree of a given size. Different log rules produce different volume estimates for the same size log. These differences depend on the way the log rule was developed. Two general formulas used to calculate timber volumes in trees and logs are the Scribner log rule and the Doyle log rule. The Scribner and Doyle log rules are based on different equations to determine volume. The relationship of the Scribner rule to the Doyle rule varies according to tree diameters. There is no signle conversion factor that is accurate for all trees. The USFS uses the Scribner Decimal C log rule, a modification of the Scribner rule, in estimating volume of standing timber at the time of its cruise. Petitioner uses the true Doyle and the Modified Doyle log rule for estimating timber volume, depending on the purpose for making the estimate. Near the bid date, petitioner typically cruises USFS timber sales on which it bids. In*440 formulating its bid price, petitioner adjusts the USFS cruise volume to reflect the volume of timber that it expects to harvest from the USFS tracts. Petitioner reported on its tax returns for 1978 and 1979 the following volume of eligible timber harvested in the South in those years: Type of timber19781979Sawtimber (in board feet):Pine56,631,48872,208,657Hardwood5,505,5364,701,133Pulpwood (in cords):Pine15,99341,290Hardwood4,0135,786The fair market values of the Louisiana eligible timber petitioner harvested in the years at issue, as claimed by petitioner on its tax returns, as amended, and as determined by respondent in the notices of deficiency, are as follows: Return orYearAmended ReturnNotice of deficiency1978$ 11,945,912$ 10,074,115197921,582,20418,134,887The estimated unit rate values of the Louisiana eligible timber as opined by the expert witnesses retained by the respective parties are as follows: Petitioner's expertsRespondent's expertsTypeSmithSamsonCochranVardamanMorrison1978Sawtimber:Pine$ 190.71$ 192.60n1  $ 152.00$ 139.16 Hardwood42.1443.6547.0038.00ND  Pulpwood:Pine11.4311.4111.837.00ND  Hardwood:3.253 to 43.072.00ND  Sawtimber:Pine$ 264.46$ 264.471  $ 212.00$ 196.50 Hardwood52.5051.0356.7752.00ND  Pulpwood:Pine14.7113.9217.259.00ND  Hardwood3.253 to 43.072.00ND  *441 OPINION Before we address the substantive issues presented in this case, we must resolve a procedural matter raised by petitioner in a post-trial motion filed under Rules 52 7 and 143(f).8 In that motion petitioner asked the Court to strike from respondent's reply brief appendices 1 and 2 on the ground that they are revised or supplemental expert*442 reports not timely filed. Petitioner argues that respondent's inclusion of the appendices in the reply brief prevents petitioner from cross-examining respondent's experts on these appendices or from submitting additional evidence on these issues. Thus, petitioner contends, the inclusion of the appendices unfairly prejudices it and, therefore, they should be stricken from respondent's reply brief. *443 Respondent impliedly argues that Rule 52 does not apply to the appendices since they are not, nor does petitioner contend they are, redundant, immaterial, impertinent, frivolous, or scandalous matter. We agree with respondent. Under Rule 52, this Court, upon timely motion by a party or upon the Court's own initiative at any time, may order stricken any redundant, immaterial, impertinent, frivolous, or scandalous matter from briefs, documents, or any other papers or responses filed with the Court. See Estate of Jephson v. Commissioner, 81 T.C. 999, 1000-1003 (1983); Allen v. Commission, 71 T.C. 577 (1979). Respondent's appendices 1 and 2 are not redundant, immaterial, impertinent, frivolous, or scandalous; Rule 52, therefore, is not applicable here. Respondent argues further that petitioner's contention that the appendices are a revised or supplemental expert's report is without merit. According to respondent, these appendices serve only to illustrate respondent's arguments in the Government's reply brief made in rebuttal to certain criticisms petitioner raises in its opening brief regarding the report prepared by Natural Resources Management*444 Corp. (NRM). 9 Respondent contends that respondent stands by the valuation estimates NRM submitted at trial, the appendices are based entirely on data reflected in the timely filed report, and are offered only in rebuttal to arguments in petitioner's post-trial brief. Accordingly, they are not a revised, supplemental, or any other type of expert report and, hence, do not violate Rule 143(f). We agree with respondent. Under Rule 143(f), this Court will exclude expert witness testimony for failure to comply with the provisions of that paragraph unless the failure is shown to be due to good cause and the failure to comply with the Rule does not unduly prejudice the opposing*445 party. Statements in briefs, however, do not constitute evidence. Rule 143(b). NRM's report was submitted into evidence without objection from petitioner. Statements in that report, as clarified and expounded upon at the trial, constitute the testimony of respondent's Oregon timber appraisers. As part of respondent's arguments in rebuttal to matters raised in petitioner's opening brief, the appendices in issue merely reformulate data already in the record; they are not intended to supplant the valuation estimates contained in NRM's report. Under these circumstances, the appendices are not part of the testimony of respondent's appraisers but are treated merely as statements in respondent's reply brief. Hence, Rule 143(f) does not apply to them. The appendices are not new evidence which respondent is attempting to introduce in the Government's reply brief contrary to Rule 143(b). Hence, petitioner's reliance on Snyder v. Commissioner, 93 T.C. 529 (1989), and Bullard v. Commissioner, T.C. Memo. 1989-244, is misplaced. We treat the appendices merely as arguments of a party, not evidence. We have not relied on them in finding the facts*446 for this case. Consequently, petitioner's motion to strike the appendices is denied. We now address the question of the fair market value of the eligible timber for purposes of section 631(a) for the years at issue. Section 631(a) 10 provides that a taxpayer may elect to treat the cutting of timber as though it were a hypothetical sale or exchange of that timber and, therefore, a taxable event. Before enactment of section 631(a)'s predecessor, section 117(k) of the 1939 Internal Revenue Code, the entire gain realized from timber cut by a taxpayer was taxed as ordinary income. Consequently, a taxpayer electing section 631(a) treatment converts what would otherwise be ordinary income into capital gain on the cutting of eligible timber. Under the scheme of section 631(a), the timber cut during a taxable period is treated as if it were sold or exchanged as standing timber on the first day of that period and the valuation is made as of that date. Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1990-339 (Supp. Memo. Op.). *447 The capital gain or loss under section 631(a) is an amount equal to the fair market value of the timber as of the first day of the taxable year in which the timber is cut, less the taxpayer's adjusted basis for depletion of the timber. The fair market value of the cut timber then becomes the new basis of the timber for all purposes in the hands of the taxpayer. The resulting gain or loss qualifies for section 1231 capital gain or ordinary loss treatment, provided the required holding period is met. Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1990-339 (Supp. Memo. Op.). In connection with the valuation of the eligible timber for the years at issue, petitioner claims that respondent is estopped from litigating certain issues which were resolved previously in the earlier cases. I. APPLICABILITY OF COLLATERAL ESTOPPEL In an amended petition filed December 14, 1984, for the 1978 and 1979 years and in the petition filed for the 1980 year, petitioner asserts that respondent is collaterally estopped from relitigating the following matters at issue and determined by this Court in Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1980-577:*448 1. In converting estimated volumes of USFS timber in the South computed by the use of the Scribner Decimal C scale to equivalent volumes using the Modified Doyle scale, "an adjustment for growth was obviously necessary to compute accurately the differences in the scales". 2. Continental Can Company, Inc. [C.C.C.] timber cut by petitioner was "at least equal in value" to the USFS timber in the South, which "provided suitable comparables for computing the proper weighted average to use in valuing the [C.C.C.] timber". 3. The sales of small tracts of timber and SBA sales in the South "clearly are not comparable" with the tracts of timber to be valued herein and "should not [be used] by respondent's experts". 4. "The value of exportable timber should clearly reflect the higher price obtainable for export timber within the framework of the comparable sales method." 5. In comparing sales of BLM timber in Oregon with volumes estimated using the short-log scale "the proper adjustment [to convert to long-log scale] was an increase of 18 percent." 6. While an adjustment for road credits is necessary in the valuation of USFS timber in Oregon, the method of adjustment used by petitioner's*449 experts is "as effective as that used by respondent's expert". 7. Special Cull and Utility grades and other "nonmerchantable" material constitute "timber" for Section 631(a) purposes, and have values separate and apart from the merchantable timber. 8. The contract prices paid by petitioner for Hill timber harvested by petitioner from the South Santiam River drainage pursuant to long-term cutting contracts with the Hill interests does [sic] not reflect the fair market value of such timber. Collateral estoppel is an affirmative defense which must be raised in a party's pleading. Rule 39. An affirmative defense not pleaded is deemed waived. Gustafson v. Commissioner, 97 T.C. 85, 90 (1991); Jefferson v. Commissioner, 50 T.C. 963, 966-967 (1968). Under the doctrine of collateral estoppel, a judgment in a prior suit precludes litigation, in a second cause of action, of issues actually litigated and necessary to the outcome of the first action. Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979). Collateral estoppel applies to issues of fact or law previously litigated. Meier v. Commissioner, 91 T.C. 273, 286 (1988).*450 In Peck v. Commissioner, 90 T.C. 162, 166-67 (1988), affd. 904 F.2d 525 (9th Cir. 1990), this Court set forth the following five conditions to determine whether collateral estoppel was appropriate: 1. The issue in the second suit must be identical to the one decided in the first suit. 2. There must be a final judgment rendered by a court of competent jurisdiction. 3. Collateral estoppel may be invoked against parties and their privies to the prior judgment. 4. The parties must actually have litigated the issues and the resolution of these issues must have been essential to the prior decision. 5. The controlling facts and applicable legal rules must remain unchanged from those in the prior litigation. Collateral estoppel, furthermore, cannot apply if the party against whom it is asserted has not had a fair and full opportunity to litigate the issue for which the doctrine is being asserted in the earlier proceeding. Meier v. Commissioner, supra at 286; see also Montana v. United States, 440 U.S. 147, 154-155 (1979) (the applicability of collateral estoppel to an issue actually and necessarily*451 determined in an earlier action depends on whether the issues presented by the later litigation are in substance the same as those resolved in the earlier action, whether controlling facts or legal principles have changed significantly since the earlier action, and whether other special circumstances warrant an exception to the normal rules of preclusion). Respondent takes no exception to the 18-percent rate of adjustment used by petitioner's experts for converting BLM timber cut in Oregon to the long-log scale. In fact, respondent's Oregon appraiser also uses the 18-percent adjustment factor. Therefore, this adjustment is not in issue and will not be discussed further. Respondent did not address at trial or on brief the issue of whether the contract price for the Hill timber reflects the fair market value for that timber. We assume, therefore, that respondent agrees that the fair market value of the Hill timber must be determined under objective standards as set forth in sections 1.631-1(d)(2) and 1.611-3(f), Income Tax Regs. See also Rev. Rul. 74-271, 1974-1 C.B. 151, which sets forth respondent's general views in agreement with this item. Respondent*452 also does not argue here that special cull and utility grade or other "nonmerchantable" materials do not constitute "timber" for purposes of section 631(a). Petitioner admits that respondent's Oregon timber appraiser, in fact, assigns some value to some of these types of timber. Thus, we assume that this item in not in issue here. The value to be assigned to this timber, of course, must be determined from the record in this case. On brief petitioner does not address specifically its assertion that respondent is collaterally estopped from relitigating whether the sales of small tracts of timber and SBA sales in the South are not comparable with the eligible timber and, therefore, should not be used by respondent's experts to value that timber. Respondent also does not address this issue. Certain criticisms of respondent's appraisers, however, stop us from assuming that petitioner has abandoned its assertion. We do not believe that our holding in Willamette I should collaterally estop respondent from litigating here the comparability of SBA sales and small tracts of timber to the tracts at issue in this case. Different eligible timber is involved here than was involved in the*453 earlier case. What timber sales are comparable to the eligible timber depends on the characteristics of the timber harvested during the years at issue, nct on the characteristics of the timber harvested during the earlier years. Thus, petitioner has not established that the controlling facts in the earlier litigation relating to this issue are identical to the facts present here; consequently, we find that this item is not appropriate for collateral estoppel. Any determination we make as to the comparability of these sales, thus, depends on the record developed in this case. The road credits issue was addressed and resolved differently in Willamette II than in Willamette I. Thus, the applicable legal rules relating to the road credits issue applicable in Willamette I have not remained the same. Consequently, respondent is not estopped from litigating the road credits issue here as a result of our holding on this issue in Willamette I. We will address this issue below. Respondent agrees that the CCC timber is at least equal in value to the Louisiana USFS eligible timber but does not agree on the manner in which petitioner's appraisers valued the CCC timber. This matter will*454 be discussed separately below. Respondent agrees further that a growth adjustment is required for the Louisiana timber but contends that respondent is not collaterally estopped from arguing that the rate of growth for the years at issue differed from the rate of growth determined in the earlier years. In addition, respondent does not agree that collateral estoppel applies to the export timber issue. These matter will be discussed separately below. In Willamette II, as supplemented by T.C. Memo. 1990-339 and T.C. Memo. 1991-389, rather than specifying a fair market value for the eligible timber as had been done in the past, we resolved various issues relating to adjustments for growth, water scale, and road credits, articulated the formula to be used to arrive at the present value of certain long-term deferred payment comparable contracts, and selected the comparable sales data bases for the Oregon timber and the Louisiana timber. In this way we set out several guidelines for the parties to follow regarding the most accurate calculation of the section 631(a) values for the years involved in that case. Neither party has raised by pleading the issue*455 of collateral estoppel of those issues actually litigated and decided in Willamette II. Indeed, at this time a final judgment has not been entered in Willamette II. Therefore, collateral estoppel is not even available at this time as a defense. Peck v. Commissioner, 90 T.C. at 166. Nonetheless, in their briefs both parties at one time or another have argued that collateral estoppel applies to a specific issue or issues determined in Willamette II. Since collateral estoppel is a waivable affirmative defense, Jefferson v. Commissioner, 50 T.C. at 966-967, which must be raised by the pleadings (Rule 39) and there must be a final judgment rendered by a court of competent jurisdiction for collateral estoppel to apply, we hold that neither party can rely in the instant case upon collateral estoppel for the issues previously resolved in Willamette II. Since the issues and related arguments raised here lend themselves to resolution along the same lines we formulated in Willamette II, however, we will use that same format here. We use the traditional fair market value formula to determine the fair market value of the eligible timber. Thus, the*456 standard to use is the hypothetical price at which the timber would be sold in a transaction between a willing seller and a willing buyer, neither being under any compulsion to sell or buy, and both having the most reliable and accurate information available on the valuation date. Buse v. Commissioner, 71 T.C. 1129 (1979); Sec. 1.631-1(d)(2), Income Tax Regs.; see also Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1987-479 and T.C. Memo. 1980-577. Consideration must be given to all factors that would affect the selling price of the timber in the marketplace. Thus, we must weigh the character, quality, quantity, and location of the timber, as well as its accessibility. We consider actual sales prices in similar transactions involving similar timber and disinterested appraisals made through the use of approved methods. Sec. 1.611-3(f), Income Tax Regs.The best indicia of the fair market value of timber for section 631(a) purposes are contemporaneous sales of comparable timber. Under this comparable sales method, the choice of comparable sales requires specific knowledge of the timber to be valued and the timber*457 actually sold. Ideally, the comparable sale will be from a tract in close geographic proximity to the timber to be valued and within the feasible area of supply of the processing facility to which the eligible timber is shipped. The comparable sale timber must be of like species, quality, quantity, etc., to be considered a valid comparable sale. Willamette v. Commissioner, T.C. Memo. 1987-479; Rogers v. Commissioner, T.C. Memo. 1983-420, affd. without published opinion 751 F.2d 370 (2d Cir. 1984). Once the comparable sales are selected, they must be adjusted to reflect equivalent quality, quantity, accessibility, and location to the eligible timber. Buse v. Commissioner, supra at 1136. Economic trends in the sale price of timber must be considered and adjustments made for such trends. Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1980-577. The theory behind the various adjustments to the comparable sales is to put the comparable timber and the subject timber on the same basis. See Buse v. Commissioner, supra.The parties have submitted expert*458 witness testimony relating to the fair market value of the eligible timber. All of the appraisers used comparable sales to value the eligible timber. We weigh expert testimony in light of the expert's qualification as well as all the other credible evidence in the record. Sundstrand Corp. v. Commissioner, 96 T.C. 226, 359 (1991). We are not bound by the opinion of any expert witness, and we will accept or reject that expert testimony when, in our best judgment, based on the record, it is appropriate to do so. Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990). While we may choose to accept the opinion of one expert in its entirety, Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980), we may also be selective in the use of any portion of that opinion. Parker v. Commissioner, 86 T.C. 547, 562 (1986). In following the format set down in Willamette II, our first step is to select the comparable sales data bases for the Louisiana and the Oregon timber. Then we will outline the necessary adjustments which must be made to those bases to arrive at the fair market value of the*459 eligible timber under a Rule 155 computation. II. SELECTION OF COMPARABLE SALES DATA BASES Five expert witnesses testified relating to the Oregon eligible timber and five expert witnesses testified relating to the Louisiana eligible timber. We find various strengths and weaknesses in the methods of analysis used by these appraisers. These areas will be discussed in more detail in our section relating to the adjustments to be made to the comparable sales data bases. We now will discuss our selection of the appropriate comparable sales data base for each area. A. Oregon Timber Base Petitioner submitted three appraisal reports in support of its calculation of the fair market value of the Oregon eligible timber prepared by: Ray E. Granvall, Jr. (Granvall), employed by Cascade Appraisal Services, Inc.; Gwynne H. Sharrer (Sharrer), employed by Mason, Bruce & Girard, Inc.; and Norman T. Marsh (Marsh), employed by petitioner. Respondent submitted one report jointly prepared by Gary C. Rynearson (Rynearson) and Stanley F. Richards (Richards), both employed by NRM. After reviewing each expert report in light of the record developed in this case, we conclude that Sharrer's report*460 is the best data base of comparable sales to be used as the foundation for the Rule 155 calculation for the Oregon eligible timber. We found his report the most balanced on the whole of the Oregon appraisals. Sharrer used virtually the same private comparable sales as Marsh, Granvall, and NRM. His firm handled some of the comparable sales for the owners, including the Avery and Holland11 sales. Consequently, he has personal knowledge about some of the timber involved. Neither Granvall nor Marsh reallocated bid prices, infra, to adjust for disproportionate bidding. We also found their reports incomplete in various key areas and their methodology sometimes inconsistent. We also found Sharrer's methodology for adjusting quality and utility grade timber more reasonable than the methods used by NRM. *461 B. Louisiana Timber Base Petitioner submitted three appraisal reports in support of its calculation of the fair market value of the Louisiana eligible timber prepared by: Donald W. Samson (Samson), employed by Donald W. Samson, Inc.; Carrol W. Cochran (Cochran), employed by petitioner; and Merlin B. Smith (Smith), self-employed. Respondent submitted two appraisal reports prepared by: James M. Vardaman (Vardaman), employed by James M. Vardaman & Co., Inc.; and James B. Morrison (Morrison), employed by respondent. We had a great deal of difficulty in selecting a comparable sales data base for the Louisiana timber. All of the appraisers excluded various categories of sales which we believe should be included in the comparable sales base. For example, none of the appraisers included CCC timber sales as comparables even though petitioner harvested CCC timber in the years at issue. Smith excluded transactions between industrial owners. Samson excluded, without explanation, some sales on which payments were made over more than 12 months and sales on which petitioner did not bid. Vardaman relied solely on private sales to determine fair market value for the eligible timber while*462 Morrison used only USFS sales as comparables. Although, because of his employment with petitioner, Cochran is the most knowledgeable about the Louisiana timber involved for the years at issue, we found his testimony lacked objectivity, evidenced by the adversarial stance he took early in the proceedings and never abandoned. Consequently, we give his report little weight. See Estate of Halas v. Commissioner, 94 T.C. 570, 577-578 (1990); Jacobson v. Commissioner, T.C. Memo. 1989-606. From the record as a whole we conclude that Smith's report is the best data base of comparable sales to be used as the foundation for the Rule 155 calculation for the Louisiana timber. We found his report the most complete and balanced of the Louisiana timber appraisers. Now we will set forth the adjustments which are to be made to the comparable sales data bases. III. ADJUSTMENTS TO THE COMPARABLE SALES BASES DATA A. Issues Involved in Willamette I or Willamette II. To one extent or another, the appraisers in the instant case have attempted to incorporate the guidelines we set forth in Willamette Industries, Inc. v. Commissioner, T.C. Memo 1987-479,*463 in their estimations of fair market value of the eligible timber involved for the years at issue. None of the appraisers, however, have followed exactly all of those guidelines. We set forth below those material issues appearing in one or both of the earlier cases which also are involved for the years in issue and our resolution of the disagreement between the parties on these issues. 1. Logging Road Costs Adjustment In Willamette II, as supplemented by T.C. Memo. 1990-339 (Supp. Memo. Op.) and T.C. Memo. 1991-389 (Second Supp. Memo. Op.), we held that the value of standing timber does not include the cost of constructing roads and, hence, the indicated market value of each eligible timber sale reflected in the expert witness report we adopted as a base for those years had to be reduced by the road construction costs reflected in the logging cost data portion of the data analysis sheets. Petitioner, nonetheless, continues to argue that the high bid is the total cost of the timber and, thus, represents the timber's fair market value. Respondent, on the other hand, contends that the proper method for adjusting for differences in road costs*464 on USFS timber is to compare USFS estimated road costs on the comparable sales to USFS estimated road costs for the eligible timber. The arguments petitioner raises here are a rehash of its arguments on this issue made in the earlier case. We were not convinced by those arguments then and are not convinced now. We addressed this issue in detail in Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1991-389 (Second Supp. Memo. Op.). There we concluded that petitioner's method of increasing the fair market value of the eligible timber by the purchaser road credits and separately deducting through amortization the cost of constructing the roads results in the practical equivalent of a prohibited double deduction. See United States v. Skelly Oil Co., 394 U.S. 678, 684 (1969); Ilfeld Co. v. Hernandez, 292 U.S. 62, 68 (1934); O'Brien v. Commissioner, 79 T.C. 776 (1982), affd. on this issue and remanded on another 771 F.2d 476 (10th Cir. 1985). Consequently, we hold that, in determining the fair market value of the standing timber, the road construction costs must be eliminated. 12*465 2. Discount To Current Cash Value of Long-Term, Deferred Payment ContractsIn Willamette II, we held that bids on long-term (i.e., greater than 12 months) contracts were to be discounted to reflect current cash value (present value). We further determined that the so-called Hammon, Jensen and Wallen (HJW) discount theory, with appropriate adjustments, 13 should be used to arrive at the most accurate cash equivalent comparable values. T.C. Memo. 1990-339 (Supp. Memo. Op.). Because the parties were unable to agree on the proper methodology for calculating the cash equivalent values, in Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1990-339*466 (Supp. Memo. Op.), we set forth the following algebraic formula to be used by the parties to determine the current cash value of the comparable sales: CE = <12> SIGMA PQ<t> t = 1 + <T> SIGMA (PQ<t> / (1 + i) [t]) t = 13 Where: CE = the cash equivalency (i.e., present value) in dollars for species S P = indicated bid price in dollars per thousand board feet for species S Q<t> = harvest volume in month t in thousand board feet of species S The cash equivalency of the contract is*467 then the sum of the cash equivalency for each species. In the Supplemental Memorandum Opinion, T.C. Memo. 1990-339, we also held that it is inappropriate to discount a private contract containing its own payment schedule and stated rate of interest. We further held that all payments received after the first 12 months are to be discounted back to the bid date and that the discount formula is to be applied to the bid price, rather than to any form of adjusted price. Petitioner continues to believe that discounting is inappropriate. Nonetheless, purportedly in order to comply with our holding on this issue in Willamette II, all but one of petitioner's experts in this case applied the HJW method we adopted in Willamette II for public timber sales. Petitioner's experts, however, discounted only back to the end of the 12th month of the long-term contract and they did not discount private contracts. Respondent's expert applied a discount to public and private timber sales for cash equivalency but did not use the HJW formula to arrive at present value. For the reasons already set forth in Willamette II, we believe that a discount is needed to reflect the present value*468 of the long-term, delayed payment contracts, involving either public or private timber. Respondent argues that the cash equivalency adjustment should be performed so as to remove inflationary expectations built into bid prices of private and public long-term contracts. According to respondent, rampant inflation drove bid prices on long-term contracts to unprecedented levels during the years at issue because bidders factored their inflation expectations into their bids. Respondent claims that bidders built longer delays in harvesting and longer delays in paying for the timber into their bids as their expectations of higher inflation rates and tighter timber supplies grew. According to respondent, the discount method used by NRM should be followed for the years in issue because that method returns the high bid prices to their current cash values by removing the bidder's estimate of inflation between the bid date and anticipated harvest or payment date. Respondent also argues that the HJW method is not pertinent to the 1978-80 timber markets. NRM relies to some extent for its discount formula upon Dr. James G Yoho, an expert in forestry economics, who also testified for respondent. *469 Dr. Yoho opined that by the late 1970's and the year 1980, real price escalation and inflation was an accepted assumption in bidding for Government long-term contracts in Western Oregon. As Dr. Yoho describes the bidding process used by forest products industry executives during these years, the bidders calculated the current market price of the standing timber under a conversion return formula 14 and then increased this amount by an assumed rate of inflation plus an estimated rate of real forest products price escalation to arrive at the bid estimates they would need to win the timber cutting contract. Dr. Yoho's formula eliminates the inflation and real price escalation assumptions from the comparable sales prices to arrive at the cash equivalent value of the eligible *470 timber. We cannot agree with his methodology. The traditional fair market value formula requires that we determine the hypothetical price at which a willing buyer would buy, and a willing seller would sell, the standing timber as of the first day of the applicable tax year. Dr. Yoho in effect acknowledges that no willing seller would sell (nor could a willing buyer buy) the standing timber at Dr. Yoho's adjusted price when he states that: Conservative companies who usually feared a business downturn "next year" were finding it impossible to win out in the bidding competition for [long-term contracts]. Instead, companies which were betting on a continuation of inflation and real price escalation for forest products were the ones winning out. Dr. Yoho's formula, thus, does more than provide a discount to current cash value for the long-term, deferred payment contracts at issue. It reduces the comparable sales prices to a value below fair market. The record clearly shows that during the years in issue the bidders could not have purchased the standing timber without adding an assumed inflation rate factor. Eliminating this factor, as respondent would have us do, would not give*471 us the price to which both the willing buyer and willing seller would agree. This goes against the essence of the fair market value method. From this record, we are convinced that the cash equivalent discount formula we set forth in the supplemental memorandum opinion, Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1990-339, with appropriate adjustments for the applicable interest rates and cutting schedule for the years in issue, infra, should be followed in the instant case. For the reasons already set forth in the supplemental memorandum opinion, all payments received after the first 12 months are to be discounted back to the bid date and the discount formula is to be applied to the bid price. Petitioner's experts did not discount private timber sales. To the extent long-term, deferred payment contracts are involved, we see no rationale to distinguish between public timber and private timber sales in the need to discount to cash equivalency, again unless the private timber contracts have their own stated interest or cutting schedules. See Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1990-339. a. Applicable*472 interest ratesThe applicable interest rates for the years in issue must be determined by reference to the various economic factors in existence during the particular period for which the interest rate is sought. Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1987-479. The experts do not agree on the appropriate interest rates to apply for the years in issue. Neither party has furnished adequate support for the rates advocated. Based on the record, however, we believe that NRM's use of the monthly average private sales rates derived from the private sales contracts, as reflected in table D of its expert witness report, are the most appropriate rates to apply to the comparable sales since those rates reflect the current rates then being applied in the standing timber market in the same geographical area as is involved here. b. Cutout PatternThe discount formula must reflect the fact that cutting of timber takes place throughout the contract period. Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1987-479. Two of petitioner's experts, Sharrer and Marsh, used the cutout schedule we determined in Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1987-479,*473 for the years in issue. The other experts developed their own cutout patterns or failed to address this issue. The record establishes that by the middle-to-late 1970s, bidders for the timber, especially Government timber, were delaying harvesting that timber until the latter years of the contract. From the record as a whole, we conclude that the cutting schedule developed by Granvall more accurately reflects the appropriate schedule to use for the years in issue and is to be used here in determining the present value of the comparable sales. 3. Inclusion of Export Sales in the Comparable Sales Data BaseRespondent argues that private sales purchased by exporters should be excluded from the comparable sales data base. The export issue was involved in both Willamette I and Willamette II. In Willamette I, for those years one of respondent's experts restricted the quantity of petitioner's eligible timber which was valued by the use of comparable sales of export timber. We found this restriction improper, stating that "We think the value of exportable timber should clearly reflect the higher price obtainable for export timber within the framework of the comparable sales *474 method." Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1980-577. In Willamette II, respondent argued that because of the promulgation of the so-called anti-substitution regulations, 15 petitioner could not participate in the more lucrative private timber export market; therefore, the comparable sales affected by the higher values bid in the private timber export market must be excluded from the comparable sales base. We again held against respondent on this issue since, based on the burden of proof and the evidence in the record, we had concluded that petitioner could have participated in the export market in the years in question and still have procured a sufficient supply of USFS timber to keep its mills and processing facilities running. Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1987-479. *475 The law relating to export timber as in effect for the years involved in Willamette I differs from the law in effect for the years in issue as a result of the promulgation of the anti-substitution regulations in 1974. The holding in Willamette I on this issue, therefore, does not collaterally estop respondent from litigating this item in the instant case. Peck v. Commissioner, 90 T.C. at 167. Petitioner argues that our holding in Willamette II relating to the export issue should be controlling here. Respondent contends that collateral estoppel does not apply to the export timber issue because of a difference in the burden of proof and formulation of the issue. As we stated earlier, the collateral estoppel defense is not available for Willamette II since there is no final judgment rendered in that case and the defense has not been pleaded. Rule 39; Peck v. Commissioner, supra at 166. Respondent argues in this case that private comparable sales purchased by exporters should be excluded from the comparable sales data base. Petitioner disagrees. We agree with petitioner. Respondent could marshal no support for the Government's position, *476 not even from respondent's own experts. The following portion of NRM's report pertaining to the export influence succinctly summarizes why we believe that respondent's position is without foundation: The activities of log exporters and the log values prevalent in the export market influenced the total timber market. Domestic processors competed with exporters for a raw material supply and had to pay prices affected by the export market if they were to secure a log supply for their manufacturing facilities. In this context, the export market influenced the prices being paid for all timber, not just that volume ultimately purchased for export. The basic export influence is therefore an inseparable part of the overall timber market, effecting [sic] the value of both private and government timber. * * * Thus, the record shows and, we believe, that the competition for export timber had a positive effect on the overall timber market. Consequently, exclusion of private timber purchases made by exporters would result in a value for the eligible timber which does not accurately reflect its fair market value. We hold, therefore, that the timber purchases of the exporters should not*477 be excluded from the comparable sales base. At respondent's request, respondent's appraisers prepared an alternate valuation for the Oregon timber which attempted to remove any influence on fair market value resulting from the export market. Since we have found that the timber purchases of the exporters are not to be excluded from the comparable sales base, we give no weight to this alternate valuation. 4. Avery Timber SalesAll of the Oregon appraisers used Avery sales as comparable sales, with adjustments for quality and logging costs. Respondent's appraisers further reduced the bid prices for Avery timber by 10 percent to adjust for the method of bidding on this timber. Petitioner's appraisers, however, did not adjust Avery timber sales for the method of bidding. Petitioner argues that the prices obtained for the Avery timber represent fair market value; therefore, no additional adjustment for the unusual bidding method is needed. Petitioner seems to have forgotten the objective to be reached here. We must determine the fair market value of petitioner's eligible timber, not the fair market value of the Avery timber. In order to determine the fair market value of*478 the eligible timber through the use of comparable sales, all material differences in the transactions must be analyzed for their effect on the fair market value of the eligible property and appropriate adjustments made. In Willamette I, we found that sales of Avery timber are valid comparable sales but the comparable sales prices must be adjusted to reflect the unusual method of sale. Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1980-577. An adjustment for Avery timber sales was not addressed in Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1987-479. We have considered all of petitioner's arguments on this issue but find them to be without merit. Respondent's appraiser for the Oregon timber estimates that a 10-percent reduction in Avery timber bid prices is needed to account for the protection a purchaser obtains from possible adverse effects resulting from any overestimation of grade which is provided by the Avery timber method of bidding by grade and species. The 10-percent "was strictly a judgment call". We agree that some adjustment for the method of bidding for the Avery timber is needed but believe that 10 percent*479 is too high. We find that a five-percent reduction in Avery timber 16 bid prices is more reasonable. 5. Scale ConversionThe Louisiana timber appraisers once again differ on the proper method to convert estimated volumes of USFS timber computed by the use of the Scribner Decimal C scale to equivalent volumes using the Modified Doyle scale. In Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1980-577, respondent's appraiser had not adjusted for growth to compute accurately the differences between the scales. We determined, however, that growth must be considered. T.C. Memo. 1980-577. Scale conversion was not at issue in Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1987-479. In the instant case most of the appraisers agree that a growth adjustment is appropriate. They do not agree, however, on the methodology to use*480 in converting from the Scribner Decimal C scale to the Modified Doyle scale. Here, each of petitioner's appraisers arrived at the estimated Modified Doyle volume of the USFS comparables by multiplying the USFS estimate of Scribner Decimal C volume of each comparable sale by a conversion factor of approximately .80. Respondent takes exception to the use of the conversion factor to convert from Scribner Decimal C to Modified Doyle. Respondent also claims that the appraisers' methodology reduced the estimated harvest volumes by too much estimated growth. Petitioner's appraisers used petitioner's estimated volume at harvest measured by the Modified Doyle log rule, reduced that volume by a growth factor to arrive at an estimated beginning volume as of the bid date, and compared that estimated beginning volume to the USFS Scribner Decimal C estimated volume made at the cruise date, generally 7-1/2 months before the bid date, to determine the conversion ratio. Respondent contends that petitioner's appraisers erroneously concluded that the estimated beginning volume in Modified Doyle was approximately .80 of the USFS estimated Scribner Decimal C volume on the cruise date by usingfaulty*481 methodology. Respondent argues, thus, that these appraisers' conversion method grossly understates the bid date volume. Respondent maintains that, when using petitioner's USFS purchases as comparables, the correct volumes to use are petitioner's own estimates of volume for those sales. These volumes reflect the volumes petitioner anticipated would be present at the time of harvest; therefore, they already are adjusted for growth and expressed in Modified Doyle scale. Consequently, respondent argues, the use of petitioner's own estimates of volume results in the actual, as opposed to the estimated, unit values bid by petitioner on USFS sales it purchased. According to respondent, a comparison of petitioner's estimated volumes to its appraisers' estimated volumes, calculated by converting Scribner Decimal C scale to Modified Doyle scale, demonstrates that the appraisers' estimated volumes are generally 25 percent lower than petitioner's estimated volumes used to formulate the successful bids. Respondent contends that petitioner's appraisers overstated the unit price for the comparable sales. Petitioner denies that its appraisers understated volume, thereby overstating the unit*482 rate. Petitioner argues, furthermore, that this Court approved the same conversion factor adjustment in Willamette I. Petitioner, however, has not pleaded that collateral estoppel applies to the entire methodology its appraisers used in converting Scribner Decimal C volumes to Modified Doyle volumes but only that a growth adjustment is needed. Therefore, petitioner has waived the collateral estoppel defense as to the general methodology used by the appraisers. Jefferson v. Commissioner, 50 T. C. at 966-967. We agree with petitioner that its estimates of harvest volume for its USFS purchases are not the correct volumes to use for the USFS comparables volumes. We have determined that, for purposes of determining the fair market value of the eligible timber, the growth adjustment should be made only to the valuation date. See infra. Therefore, petitioner's harvest estimates include too much growth and should not be used for this purpose. Respondent further contends that Morrison's USFS volumes are more accurate and should be used for estimating volumes of comparable USFS purchases not acquired by petitioner. Petitioner questions the adequacy of Morrison's*483 methodology. We agree with petitioner that Morrison's volume estimates are not reliable. Respondent's appraiser Morrison did not use a conversion factor to redetermine USFS Scribner Decimal C volumes to Modified Doyle volumes. Rather, he calculated a Modified Doyle volume as of the USFS cruise date by applying Doyle volume tables to USFS cruise data contained in the USFS sale prospectus. Morrison's methodology included, among other things, applying an assumption of tree heights and form classes based solely on his knowledge and experience. We do not find this methodology reliable. We believe, however, that petitioner's appraisers also used faulty methodology in deriving their conversion factor since they compared the Modified Doyle estimated volume at the bid date to the USFS Scribner Decimal C estimated volume at the cruise date to determine the applicable conversion factor even though the cruise date was earlier. To be more accurate, we believe that the appraisers also should have projected the USFS Scribner Decimal C estimated volume to the bid date before calculating the conversion factor. The parties presented no evidence on an appropriate cutting schedule for the Louisiana*484 timber for the years in issue. We find that the schedule used by both Samson and Morrison should be used for these years. We discuss below the rate of growth which we determine is appropriate to use for the years in issue. 6. Growth AdjustmentUSFS contracts in Louisiana are cut out on a compartment or unit basis. The bid price for a unit or compartment on a USFS tract is based on the volume determined from the cruise date (approximately 6 to 9 months before the bid date); therefore, the growth inures to the benefit of the purchaser. In Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1987-479, we found that the USFS timber in Louisiana generally grows at a rate of seven percent per year and that, for purposes of section 631(a), comparable sales of USFS timber should be adjusted for the growth which took place between the cruise date and the valuation date and that a 7-1/2 month adjustment period for growth between the cruise date and the actual sales date was a fair time period. Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1990-339 (Supp. Memo. Op.). Two of the appraisers for the Louisiana timber, Smith and *485 Samson used the 7 percent, 7-1/2 months growth adjustment we found in Willamette II. Two of the appraisers, Vardaman and Cochran, made no growth adjustment for this purpose. The remaining appraiser for the Louisiana timber, Morrison, opined that a 6-percent growth adjustment was appropriate. The parties have presented no credible evidence to establish a different rate of growth 17 for the years in issue from the rate we determined in the earlier case. Morrison testified that he surveyed several USFS tracts and measured growth rings. He, however, introduced no evidence to establish that his survey, conducted many years after the years in issue, accurately depicts the growth rate applicable for the years involved here or that the tracts he surveyed sufficiently represent the eligible timber to warrant a different growth adjustment. Consequently, we hold that the appropriate growth adjustment for the years in issue is 7 percent per year and that a 7-1/2-month adjustment period for growth between the cruise date and the actual sales date is to be used. *486 Respondent again maintains that the appropriate volume estimate which should be used for determining what the bidder paid on a unit basis is the volume on which the bidder formulated his bid price; i.e., the volume which the bidder anticipated he would harvest. Therefore, respondent argues, the growth estimate should be made to the date of harvest. Respondent has presented no new evidence or argument which would cause us to change our conclusion in Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1987-479, as supplemented by T.C. Memo. 1990-339 (Supp. Memo. Op.) and T.C. Memo. 1991-389, (Second Supp. Memo. Op.), that the proper cutoff for growth of the Louisiana timber is the valuation date. 7. Continental Can Timber Respondent agrees that the CCC eligible timber is equal in value to the USFS eligible timber harvested or sold in the years in issue. Respondent, however, disputes petitioner's exclusive use of USFS comparable sales to value the CCC eligible timber. According to respondent, the real issue is whether the arm's-length negotiated market value for the CCC comparable timber represents the fair market *487 value of the CCC eligible timber for purposes of this case. Respondent contends that the negotiated price for the CCC comparable timber was the best evidence of the fair market value of the CCC eligible timber. None of the appraisers for the Louisiana timber used CCC timber sales as comparable transactions. Vardaman, however, claims that he would have used CCC transactions as comparables had he known the true manner by which the negotiated market value of the CCC timber was determined. Petitioner, on the other hand, argues that the prices paid under the CCC contracts do not represent fair market value because the complex transactions between the parties involved other considerations. Petitioner further argues that, since the CCC timber is at least equal in value to the USFS timber, it is proper to use USFS comparable sales to value both CCC and USFS eligible timber. We agree with respondent that the negotiated market value of CCC timber represents its fair market value. However, respondent agrees that the CCC eligible timber is at least equal in value to the USFS eligible timber harvested in the years in issue. Although, for completeness, we would have preferred for the Louisiana*488 timber appraisers to have included also CCC timber comparable sales in their comparable sales data bases, we are not convinced from the evidence here that the exclusion of the CCC timber comparable sales unreasonably skews the end result. Therefore, on this record, we also agree with petitioner that it is proper to use USFS sales to value both the CCC and USFS eligible timber. B. Issues Not Involved in Earlier Cases In addition to issues previously addressed in the earlier cases, the parties cannot agree on the following issues. 1. Time Trend AdjustmentRespondent contends that the 1979 comparable sales for the Oregon timber, particularly private timber sales, must be adjusted for price trends over time to correct for a heavy imbalance of comparable sales occurring after the valuation date in a rapidly rising stumpage market. According to respondent, in a rising market, an appraiser using the market approach must balance the comparable sales around the valuation date to avoid a skewed result (value too low if more sales before the valuation date are included or too high if more sales after the valuation date are included). Respondent's expert adjusted the comparable*489 sales to account for the rising market and imbalance of sales after the valuation date through a time trend index NRM developed for that purpose. Respondent contends that the time trend adjustment index developed by the Government's expert seeks to capture a purchaser's expectation of future inflation, supply-demand projections, and other factors which would influence the amount bid at any given time. NRM constructed its time trend index using data relating to sales of public timber. The index measures the percentage rate of change in USFS bid prices over time. NRM then adjusted both public and private bid prices forward or backward to the applicable valuation date by this rate of change. According to respondent, since, for public timber sales, the comparable sales used by the appraisers were relatively balanced on both sides of the valuation date, the time trend adjustment had only a slight effect on NRM's value estimates for the public timber. Private timber sales, on the other hand, were weighed heavily to dates after the January 1, 1979, valuation date. NRM's time trend adjustment had a significant impact on indicated values of the private comparables for 1979. None of*490 petitioner's experts adjusted comparable sales for market changes during this period. Respondent argues that petitioner's appraisers overstated the value of petitioner's 1979 private eligible timber by failing to adjust their 1979 private comparable sales for time. Petitioner's experts agree that time adjustments should be made when appropriate, generally when there is a significant distance in time between the valuation date and the comparable sale date and the market is changing rapidly. They also agree that, in general, the Oregon timber market was rising rapidly from mid-1978 through 1980. Petitioner's experts do not concede, however, that private stumpage prices were rising from 1978 through 1979. Petitioner agrees that time trending is merited if the facts warrant its application and it is applied properly; but argues that the building of a valid stumpage price index requires careful consideration of basic differences in timber quality, logging costs, and cash-equivalency among the sales used to establish the index. According to petitioner, NRM disregarded all of those differences. Petitioner argues further that, in developing its time trend index, NRM erroneously compares*491 low quality timber sales occurring before the valuation date with high quality timber sales occurring after the valuation date. Therefore, petitioner contends, NRM's time trend index erroneously depicts a rising market for the 1979 sales when actually there merely is a difference in quality. Petitioner additionally argues that in constructing its index, NRM fails to adjust for differences in logging costs. Moreover, petitioner argues that NRM's cash equivalency adjustment already corrects for inflation. Consequently, petitioner contends, NRM adjusts the comparable sales twice for the same reason. Respondent concedes that the timber in the 1979 sales was higher in quality than the timber in the 1978 sale. NRM also admits that it made no adjustments in developing its index for differences in cash equivalency, quality, road costs, etc. Respondent, however, denies that these factors distort the index. Respondent also does not agree that its index results in a double adjustment. Petitioner additionally contends that the application of a USFS timber sale index to private sales is contrary to the well-established line between public timber and private timber this Court has drawn*492 over the years. According to petitioner, unlike the Government, private timber owners can respond rapidly to higher prices and lower supply by placing their timber on the market with little or no delay. As a result, prices for private timber are moderated by the interaction of supply and demand. Thus, petitioner contends, public timber prices spiraled upward during the years in issue while private timber prices showed moderate downward fluctuations. Petitioner argues that, if a time-trend adjustment is required, then the USFS Douglas Fir Region Monthly Index (DFRMI) should be applied both to public and private sales, since it is based on prices of end products, which are free of any public/private distinctions. DFRMI indicates current end product prices adjusted for log scale. It is a current index, adjusted using monthly information, and is used by the USFS on a quarterly basis. One of petitioner's experts, Sharrer, testified that he considered DFRMI to be a reasonably good index for indicating changes in stumpage price as reflected by end product use and price. According to respondent, bid prices for both private and USFS timber were experiencing similar rates of change *493 from 1978 through 1980. Therefore, respondent argues, NRM's use of an index based on USFS bid prices to time adjust private comparable sales was proper. We agree with respondent that an adjustment is needed but do not agree that NRM's index is a reasonable method for this purpose. One of petitioner's rebuttal witnesses, Green, concedes that if a correlation is developed between what private sales and public sales were doing, it would be proper to apply the same time index to both private and public sales. We agree, however, that the record here shows no correlation between private timber and public timber bid price changes. In fact, the record indicates that the public timber bid prices rose at a much sharper level than did the private timber bid prices for the same period. We find little support, however, for petitioner's contention that there was a slight downward trend in private timber sale prices during the 6-month periods on either side of the valuation date. Because of the rapid price appreciation occurring during the period between the valuation date and the comparable sales dates, we believe that the use of a time adjustment based on experience data for this time period*494 is reasonable. See Estate of van Loben Sels v. Commissioner, T.C. Memo. 1986-501. We believe it is not reasonable, however, to compute the rate of change during this period without making adjustments for other differences in the timber, such as quality, quantity, logging costs, etc., which otherwise account for the price differential. Moreover, we have serious reservations about using an index computed on the basis of public timber bid prices to adjust private timber bid prices where there has been no showing that public bid prices and private bid price were similarly affected. However, we also believe that using an index (DFRMI) computed on the basis of end product prices (i.e., the conversion return method) to compare bid prices determined on the market value method is unreasonable. There is evidence in the record that during the years in issue stumpage prices were rising more rapidly than the general rate of inflation. Therefore, in lieu of anything better, we hold that an adjustment for changing market conditions before and after the valuation date should be made at a rate of the general rate of inflation for the comparable time period plus 2 percent. *495 2. Logging CostsLogging costs include all of the costs for planning, engineering the harvest, and removing the timber and hauling it to a manufacturing facility. Removal costs include falling and bucking 18 the timber, yarding 19 and loading the logs on the trucks, and transporting the logs to a manufacturing facility. Other preparatory and associated costs encompassed in logging costs may include road construction, road maintenance, administration of the harvest, and fire protection. Post-harvest costs contained in logging costs may include winterizing skid roads and truck roads. The Oregon timber appraisers all agree that an adjustment for logging costs is needed to compare properly the comparable timber sales to the eligible timber. The appraisers do not agree, however, on the appropriate method to use to make this adjustment. In Buse v. Commissioner, 71 T.C. at 1136,*496 we stated that "where comparables containing estimates of logging cost and timber quality are used, the better approach is to compare such estimates of [the taxpayer's] logging costs and timber quality." Two of petitioner's appraisers, Marsh and Sharrer, compared estimated logging costs for private comparable timber sales with petitioner's actual logging costs for the private eligible timber. Petitioner's other appraiser, Granvall, developed an estimated logging costs for the private eligible timber based on petitioner's actual logging costs, from which he eliminated profit and risk and haul costs. Petitioner does not account for its logging costs on the basis of source (i.e., public or private timber); therefore, Granvall had to estimate the logging costs for public and private timber. He estimated that public timber logging costs were 8 percent higher than private timber logging costs and, therefore, made his logging cost adjustment on that basis. Respondent's expert, NRM, developed an estimate for private eligible timber logging costs based on logging contracts petitioner had entered into with logging contractors before the timber was harvested. Consequently, it does not rely*497 on petitioner's actual costs incurred for logging. Neither Granvall nor NRM has provided much support for his method of adjusting for logging costs to help us determine the best method to follow here. Based on the record as a whole, however, we believe that NRM's methodology comes closest to the preferred method of comparing estimates to estimates. Buse v. Commissioner, 71 T.C. 1129 (1979). Consequently, we hold that the logging costs adjustment as used in NRM's report is to be followed here. 3. Oregon Severance Tax The Oregon appraisers also are not in agreement as to how to treat the Oregon severance tax payable to the State of Oregon on the harvesting of privately-owned timber in Western Oregon. Three of the appraisers, Sharrer, Marsh and NRM, included the severance tax as a logging cost adjustment, accounting only for the difference between the severance tax imposed on the private eligible timber and the tax imposed on the private comparable timber. The remaining appraiser, Granvall, did not include the severance tax for the private eligible timber or for the private comparable timber where the seller paid the tax. He did include the severance*498 tax, however, as a logging cost estimate for private comparable timber where the seller required the buyer to pay the tax. The parties have opposing views as to how the severance tax issue should be framed. According to petitioner, the issue is whether the Oregon severance tax reduced the fair market value of the private eligible timber cut in 1978, 1979, and 1980. Respondent views the issue as whether Granvall erred in increasing the fair market value of the private eligible timber by the severance taxes imposed on the private comparable timber. We note that respondent misstates Granvall's treatment of the severance tax in that Granvall includes the severance tax as a logging cost estimate only for those private timber comparable sales in which the buyer pays the severance tax. In essence, he treats the severance tax as an obligation of the seller and, therefore, payment of that obligation by the buyer as additional compensation for the private timber. Petitioner contends that the fair market value of the private eligible timber should not be reduced by the amount of severance tax payable to the State of Oregon. According to petitioner, Oregon severance taxes do not affect*499 the basis of private timber but "are taken into account only in the rare instances in which the buyer is required to pay the seller's obligation to the Oregon Department of Revenue. The difference between the amount of severance taxes imposed by the seller on the purchaser on such sale and the otherwise comparable sale would be the only relevant factor." Respondent argues that none of the Oregon appraisers reduced the subject private timber fair market values by severance taxes. Rather, all of the appraisers except Granvall made a severance tax adjustment similar to the logging cost adjustment in which they accounted for the difference between the severance tax imposed on the private comparable timber and the severance tax imposed on the private eligible timber. Petitioner relies on Estate of Smith v. Commissioner, 57 T.C. 650, 659 (1972), affd. on another issue 510 F.2d 479 (2d Cir. 1975), in support of its argument that the fair market value of property is not affected by taxes, brokers' commissions, or other expenses that the seller incurs by reason of the sale. That case dealt with the question whether the value of a number of sculptures*500 created by the decedent based on their gross sales price should be reduced by the commissions the decedent's broker had a contractual right to receive. We found that the value of the sculptures should not be reduced by the commissions, stating generally that "The measure of value * * * is what could be received on, not what is retained from, a hypothetical sale." Estate of Smith v. Commissioner, supra at 659. That general rule, however, is not applicable under the circumstances here since it is well established that, in determining fair market value of standing timber for purposes of section 631(a), comparable sales must be adjusted to reflect equivalent quality, quantity, accessibility, and location to the eligible timber. See Buse v. Commissioner, 71 T.C. at 1136; sec. 1.611-3(f)(1), Income Tax Regs.The parties again have provided very little support in the record to help us resolve this issue. We are persuaded, however, from what little we do have, that the Oregon severance tax is a factor which would affect the selling price of the timber in the marketplace and is similar to a logging cost; therefore, the severance tax *501 should be treated in the same manner as logging costs. Consequently, we hold that the method for adjusting for the Oregon severance tax used by NRM, Marsh, and Sharrer should be followed here. 4. Reallocation of Bid PriceThe record shows that, because of the manner of bidding on USFS contracts in Oregon, disproportionate bidding sometimes occurs on various species of timber. Some of the appraisers reallocated the bid price to adjust for the skewed bidding while others did not. Since the appraisers used bid prices by species of timber for the comparable sales to estimate the fair market value of the eligible timber, we believe that reallocation of the bid price is appropriate. After reviewing the reports of the appraisers, NRM and Sharrer, who did reallocate, we are persuaded that NRM's method more closely approximates the method which the bidder would have followed in formulating his bid and, therefore, should be used here. 5. Utility Grade TimberPetitioner takes exception to the value NRM assigned to utility grade timber. NRM used a conversion return method to determine the value of eligible utility grade timber. Concluding that the logging costs for most*502 of the eligible utility grade timber exceeded the utility log prices, it assigned a value of zero to most of this timber. This issue addresses the value to be assigned to the utility grade timber, not the character of the timber itself. We have determined that Sharrer's comparable sales data base, with the adjustments specified, is to be used to determine the fair market value of the Oregon eligible timber. We find no fault with Sharrer's method of valuing utility grade timber. Therefore, the values assigned to the utility grade timber as determined by Sharrer, after any suitable adjustments as specified, are to be used for this type of timber. 6. Volume of Louisiana Timber for 1979At trial and on brief, petitioner claims that the actual volume of Louisiana eligible sawtimber cut in 1979 is as follows: TypeReportedActualDifferencePine72,208,65772,935,795727,138Hardwood4,701,1334,703,4372,304Respondent does not agree with the revised numbers petitioner propounds as the correct volume of eligible sawtimber harvested in 1979. According to respondent, the parties established the volume of Louisiana eligible timber harvested in 1979 through*503 a request for admissions petitioner served on respondent, which respondent answered. The subject request for admissions reads as follows: 34. Exhibits 44-MM, 45-NN and 46-OO are production summary schedules showing the timber cut by Willamette in the South and the timber cut by Santiam Southern Company during the years 1978, 1979 and 1980 which was eligible for treatment under Section 631(a) of the Code. Respondent's response to this request for admissions reads as follows: 34. Admits that Exhibits 44 and 45 show eligible timber cut by Willamette and by Santiam Southern Company during the respective years of 1978 and 1979. Admits for identification purposes that Exhibit 46 purports to be a production summary schedule of timber cut during 1980. The volume of eligible timber reported on the production summary schedule for 1979 in total corresponds to the volume reported on the 1979 return. Petitioner has submitted no reliable evidence to establish that the volume of timber shown on the revised schedule presented at trial is accurate. As a result, petitioner has not met its burden of proof as to this issue. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).*504 We find, consequently, that the volume of eligible timber to be used for 1979 is the volume reflected on the tax return for that year as set forth earlier in our findings of fact. We, therefore, need not determine whether the parties are conclusively bound by any admission regarding the volume of eligible sawtimber cut in 1979. 7. Volume of Bid-and-Lost ComparablesThe Louisiana timber valuation is based on a unit price per thousand board feet (sawtimber) or cords (pulpwood). The unit price determined for lump-sum comparable sales is a function of both the total bid price and the total volume of timber. In arriving at their estimate of the fair market value of the eligible timber, petitioner's appraisers, in addition to other sales, considered as comparables those sales of timber on which petitioner bid but did not obtain the contract (bid-and-lost sales). Respondent argues, among other things, that the data petitioner's appraisers used for the bid-and-lost sales is not reliably accurate and should not be used for the years in issue. According to respondent, petitioner's appraisers apparently used the total high bid price for the bid-and-lost transactions, but they *505 did not use the successful bidder's estimated volumes used to formulate that high bid. Instead, petitioner's appraisers used volume and unit prices, based on petitioner's volume estimates for those bids, which petitioner assumed the successful bidder used. At trial petitioner introduced a schedule which analyzes data from sales on which petitioner was the successful bidder and which compares the volume bid and the volume harvested over a 9-year period to support its use of its own volume estimates to determine bid-and-lost sales volumes. Respondent argues that this schedule misses the point that the successful bidder formulated his bid on his own estimated volumes, not on petitioner's estimates. According to respondent, petitioner's calculated volumes resulted in an overstatement of unit price for the bid-and-lost sales. Respondent maintains that the bid-and-lost sales data based on petitioner's volume estimates is not a reliable indicator of fair market value. We agree with respondent. At trial, respondent introduced evidence which at the minimum cast doubt on the accuracy of the estimated volumes and, hence, the unit prices petitioner's appraisers determined for the bid-and-lost*506 sales. Petitioner, on the other hand, introduced no credible evidence to support the volumes it assumed were used by the successful bidders to formulate their bids. Without knowing the volume on which the successful bidder formulated his bid, it is impossible to determine accurately the unit price for the timber used as a comparable sale. Consequently, we hold that the bid-and-lost sales should not be included in the comparable sales data base for the Louisiana eligible timber, unless the comparable sale unit price has been determined using the successful bidder's own estimated volume. 8. Adjustment for Doyle ScaleOne of respondent's appraisers, Vardaman, adjusted the reported volume of petitioner's purchases of timber during 1978 and 1979 used as comparables by 10 percent due to his understanding that petitioner used one rule, true Doyle, to measure standing timber but used another rule, Modified Doyle, to measure the eligible timber. Based on evidence developed at trial, respondent now concedes that the 10-percent upward adjustment in volume was unwarranted. 9. Risk of LossOne of respondent's appraisers, Morrison, factored in a risk-of-loss adjustment to *507 the eligible timber not obtained from the USFS or CCC. According to respondent, the risk-of-loss adjustment factor is a carrying cost for holding private lump-sum timber comparable to the amount it would cost to insure the unharvested timber against the risks of loss generally borne by the purchaser. To make his risk-of-loss adjustment, Morrison increased by 1 percent the discount rate he used to derive the present value of the USFS bid prices. Petitioner argues that any beneficial risk-of-loss provisions of the USFS contracts are more than offset by negative characteristics of the USFS contracts (e.g., strict environmental controls, red tape, road-building requirements, etc.). Neither party submitted any evidence to quantify the differences in risk, or any offsets to that factor, between the USFS and CCC timber and the other private timber involved in the instant case. There are obvious costs as well as benefits involved in acquiring public timber. By the same token, there are costs and benefits in acquiring private timber. We have been provided no basis on which to make a costs/benefits analysis. On the basis of this record, therefore, we believe that no risk-of-loss adjustment*508 can be made. We have considered other arguments relating to the valuation issue raised by the parties but find them to be without merit. Based on our selection of the comparable sales bases and the adjustments to those bases, the parties now should be able to calculate the fair market value of the eligible timber. Decisions will be entered under Rule 155.Footnotes1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩2. The sec. 461(f) issue involved $ 20 million of a contested liability which petitioner deducted on its 1981 tax return. The issue was severed by order of this Court dated July 16, 1987. A separate trial was held on the sec. 461(f) issue and our opinion was filed on May 23, 1989. See Willamette Industries, Inc. v. Commissioner, 92 T.C. 1116↩ (1989).3. See also Peek v. Commissioner, T.C. Memo. 1983-224↩, for a detailed description of the United States Forest Service (USFS) bidding process and contract requirements.4. The notice of deficiency does not mention the fair market value of the 1978 eligible timber harvested by Freres. Freres' original 1978 partnership return showed $ 4,914,249 as the value for the eligible timber. Freres filed an amended return in 1983 in which, among other things, it increased the fair market value of the eligible timber to $ 5,970,907. Respondent did not accept the increased value for the eligible timber reported on the amended return but made no adjustment to the value reported on the original return.↩5. A timber cruise is a method of surveying standing timber (stumpage) for the purpose of estimating species composition, volume, grade, etc., in a particular area.↩1. Cochran's report does not reflect final values for pine sawtimber. In their briefs, the parties propounded the following values for the pine sawtimber as derived from Cochran's expert witness report: 19781979Resp.Petr.Resp.Petr.Pine sawtimber:$ 207.27$ 203.76$ 287.13$ 287.61Neither counsel furnished an explanation as to how he derived his numbers. After a diligent attempt, the Court could not resolve the discrepancies. Since we do not adopt Cochran's estimates of fair market value, see infra, it is not necessary for us to make a finding here as to the unit value for pine sawtimber he determined.6ND = not determined ↩7. Rule 52 provides as follows: RULE 52. MOTION TO STRIKE Upon motion made by a party before responding to a pleading or, if no responsive pleading is permitted by these Rules, upon motion made by a party within 30 days after the service of the pleading, or upon the Court's own initiative at any time, the Court may order stricken from any pleading any insufficient claim or defense or any redundant, immaterial, impertinent, frivolous, or scandalous matter. In like manner and procedure, the Court may order stricken any such objectionable matter from briefs, documents, or any other papers or responses filed with the Court. ↩8. Rule 143(f) provides, in pertinent part, as follows: RULE 143. EVIDENCE * * * (f) Expert Witness Reports↩: (1) Unless otherwise permitted by the Court upon timely request, any party who calls an expert witness shall cause that witness to prepare a written report for submission to the Court and to the opposing party. The report * * * shall state the witness' opinion and the facts or data on which that opinion is based. The report shall set forth in detail the reasons for the conclusion, and it will be marked as an exhibit, identified by the witness, and received in evidence as the direct testimony of the expert witness, unless the Court determines that the witness is not qualified as an expert. Additional direct testimony with respect to the report may be allowed to clarify or emphasize matters in the report, or otherwise at the discretion of the Court. If not furnished earlier, each party who calls any expert witness shall furnish to each other party, and shall submit to the Court, not later than 30 days before the call of the trial calendar on which the case shall appear, a copy of all expert witness reports prepared pursuant to this subparagraph. An expert witness' testimony will be excluded altogether for failure to comply with the provisions of this paragraph, unless the failure is shown to be due to good cause and unless the failure does not unduly prejudice the opposing party, such as by significantly impairing the opposing party's ability to cross-examine the expert witness or by denying the opposing party the reasonable opportunity to obtain evidence in rebuttal to the expert witness' testimony. * * *9. Two employees of NRM, Gary C. Rynearson and Stanley F. Richards, contributed to the expert witness report submitted by respondent in support of respondent in support of respondent's valuation of the Oregon eligible timber. For convenience, unless otherwise required for clarity, we refer to respondent's Oregon appraisers collectively as NRM.↩10. Sec. 631(a), as in effect during the years in suit, provides as follows: SEC. 631. GAIN OR LOSS IN THE CASE OF TIMBER, COAL, OR DOMESTIC IRON ORE.(a) Election to Consider Cutting as Sale or Exchange. -- If the taxpayer so elects on his return for a taxable year, the cutting of timber (for sale or for use in the taxpayer's trade or business) during such year by the taxpayer who owns, or has a contract right to cut, such timber (providing he has owned such timber or has held such contract right for a period of more than 1 year) shall be considered as a sale or exchange of such timber cut during such year. If such election has been made, gain or loss to the taxpayer shall be recognized in an amount equal to the difference between the fair market value of such timber, and the adjusted basis for depletion of such timber in the hands of the taxpayer. Such fair market value shall be the fair market value as of the first day of the taxable year in which such timber is cut, and shall thereafter be considered as the cost of such cut timber to the taxpayer for all purposes for which such cost is a necessary factor. * * *↩11. The record in the instant case provides little information about the Holland timber other than that NRM applied a 10-percient adjustment to these comparable sales, the timber was sold under the same method as used for the Avery timber sales, and Sharrer's firm handled Avery and Holland timber sales. As in other matters throughout the proceedings, the parties appear to have forgotten that we must resolve the issues in this litigation on the basis of the record developed here, not on the record developed in the earlier cases.↩12. Cf. sec. 1.1016-6(a), Income Tax Regs., which provides: Sec. 1.1016-6. Other applicable rules. (a) Adjustments must always be made to eliminate double deductions or their equivalent. Thus, in the case of the stock of a subsidiary company, the basis thereof must be properly adjusted for the amount of the subsidiary company's losses for the years in which consolidated returns were made.↩13. One adjustment to the HJW formula was to the assumed cut-out schedule. We determined that 12 percent of the timber should be assumed to be cut in the first year of the contract, with the remaining 88 percent of the timber assumed cut out evenly over the following years of the contract, unless the contract specified a cut-out schedule (in which case the contract schedule controls). Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1987-479, supplemented by T.C. Memo. 1990-339↩.14. The conversion return method begins with the current values of end products expected to be produced from the timber, subtracts the costs of logging and manufacture and a profit and risk factor, leaving a residual or conversion return value.↩15. Timber Export and Substitution Restrictions, 39 Fed. Reg. 9663 (Mar. 13, 1974). The underlying rationale of the regulations, 36 C.F.R. sec 221.25 (1974); 36 C.F.R. sec. 223.10 (1977), is to prevent companies from selling their private timber into the more lucrative export market while purchasing public timber at low cost from the Government. Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1987-479↩.16. Our holding also applies to any Holland timber comparable sales for the years in suit. See supra↩ note 11.17. Cochran included in his report a USFS notice to timber purchasers dated Feb. 23, 1984, alerting potential purchasers of USFS timber of a revised, lower rate of growth which the USFS would be using on future timber sales contracts. The notice represents that the percentages were derived from a study of current research information. No information is furnished as to the period covered by this research information. Consequently, we have given this notice no weight for our purposes.↩18. Bucking is cutting a felled tree into log lengths. ↩19. Yarding is the act of moving logs from the location of felling to the landing.↩